THE STATE OF KANSAS, on the *relation* of *S. B. Bradford, Attorney General*, v. J. R. STOCK, *et al.*

1. MANDAMUS; *The State, Not Barred.* In an original action in this court, instituted by the attorney general in the name of the state, to compel the county officers of Rush county to keep their offices at the county seat, and to determine its location, it being but an exercise of the sovereign power of the state, compelling obedience to its statutory mandates, the cause of action alleged is not barred by the statutes of limitation, they having no application to cases wherein the state is the moving party.

2. PRIVATE JUDGMENT, *The State not Bound by.* A suit prosecuted by an elector of Rush county, under and by virtue of the provisions of chapter 79, Laws of 1871, and the amendment thereto of chapter 126, Laws of 1872, against the county clerk, to compel him to keep his office at a place claimed by the relator to be the duly-chosen county seat, such action resulting in a judgment in favor of the relator; and such judgment having been subsequently declared by this court, in an action between private parties, to be binding, is not conclusive, and does not bind the state in this action. Here the state, in the exercise of one of its sovereign powers, is attempting to compel obedience to its laws, and cannot be bound by the judgment and proceedings of an action essentially private in its character, and instituted wholly to protect the pecuniary interests of a citizen of the county, as affected by the result of a county-seat election.

3. COUNTY-SEAT ELECTION; *Sufficiency°of Petition.* It was not required under the law in force at the time the election was held, which is the subject-matter of this controversy, that the petition presented to the county board, and upon which the order for the election is based, should contain the signatures of more than three-fifths of the same identical names that were found on the assessment rolls and property statements of the preceding year. It is sufficient if it appears that there was signed to the petition a number of names of legal electors of the county, equal to three-fifths of the number of legal electors, as shown by such assessment rolls and property statements; and a legal elector of the county whose name did not appear on such rolls or statements, had a right to sign such a petition and have his name counted and considered in the determination of the sufficiency of the petition. The case of *The State, ex rel., v. Comm'rs of Phillips Co.*, 26 Kas. 420, does not decide the question, and has no reference to it.

4. STATUTE, *Not Declaratory.* Section 4 of chapter 26, Gen. Stat. 1868, as amended by the Laws of 1883, §2, chapter 91, is in no sense a de-

claratory statute. It is an entire change of the phraseology, force and effect of the section, as it read before such amendment, and has no application to the action of the board of county commissioners in their determination of the sufficiency of a petition for an election to relocate a county seat, presented in the year 1878, and long before the amended section became a law.

5. ——— *Question; Admissible Evidence.* In actions of this character, the inquiry and issue framed is, "Which place is the county seat?" and all evidence tending to show fraudulent practices by illegal votes cast for, and legal votes rejected for both places, is admissible.

6. ELECTOR *Must Vote, Where.* An elector must vote in the township or ward in which he has resided, at least thirty days next preceding the election at which he offers to vote. If he attempts to vote out of the township or ward of his residence, his ballot should be rejected. If he does so vote, it is an illegal one.

## Original Proceedings in Mandamus.

ACTION brought in the name of the state, on the relation of the attorney general, against all the county officers of Rush county, to compel them to remove their several offices from La Crosse to Rush Center or Walnut City, and there to keep their offices as the legal county seat of Rush county.

The alternative writ of mandamus, omitting caption, reads as follows:

*The State of Kansas to J. R. Stock, A. C. Lippert, and J. E. Ruhl, County Commissioners; L. K. Hain, County Clerk; J. A. Yawger, Clerk of the District Court; J. F. Edwards, County Surveyor; A. J. Redman, Sheriff; L. T. Delaplain, Probate Judge; W. E. Semple, Superintendent of Public Instruction; R. F. Ward, Register of Deeds; G. Stulkin, County Treasurer; Thomas Tweedy, County Attorney; Dr. W. J. Phillips, Coroner; and S. J. Osborn, Judge of the Twenty-ninth Judicial District of the State of Kansas— Greeting:*

Whereas, an application for a mandamus to each of the above-named defendants, duly verified, has been presented to the undersigned, a judge of the supreme court of the state of Kansas, by which it is made to appear that at an election duly held in the said county of Rush on the 12th day of February, 1878, for the purpose of relocating the county seat of the said county of Rush, a majority of the votes cast at said election were in favor of the town of Walnut City for said county seat. That the returns of said election were duly made to and canvassed by the county commissioners of said county of Rush, sitting as a board of canvassers. And upon said canvass it was ascertained and determined by said county commissioners, sit-

ting as a board of canvassers, that a majority of the votes so cast at the said election as aforesaid were for the town of Walnut City, which finding and determination were proclaimed by the said board of county commissioners and were by them made a matter of record in the records of said county. That upon said proclamation of said election the then county officers of said county of Rush removed from the town of LaCrosse, where the county seat of said county of Rush had theretofore been, with their respective offices, and books, records, papers and documents belonging to the same, and to the town of Walnut City, and held their respective offices at said town of Walnut City, and kept there the records, papers and documents of their respective offices until about the 30th day of November, 1882, at which time the then county officers, without any authority for so doing, removed their respective offices, together with the books, records, papers and documents belonging to the same, to the town of La Crosse, at which place they have since remained, and the present county officers now keep the same there, without authority of law for so doing, and pretend to do and transact the business of their respective offices at said town of La Crosse, and neglect and refuse to hold their respective offices and discharge the duties thereof at the town of Walnut City, and do compel the citizens of said county to transact their public business at said town of La Crosse, instead of transacting it at the county seat of said county, the town of Walnut City. And that upon and after the said proclamation, declaring and proclaiming Walnut City to be the county seat of said county of Rush, the district court sitting in and for the said county held its terms at said county seat, Walnut City, until on or about the — day of May, 1883, when said court again held its terms at La Crosse, and has since said date, without authority for so doing, continued to hold the said terms of said court at the said town of La Crosse.

That since the said election and the canvass, determination and proclamation of result thereof, as aforesaid, there has not been in said county of Rush any other election for the purpose of removing the county seat of said county, or for relocating the same, nor has there been any judicial determination setting aside or annulling or vacating the said election, determination or proclamation, which decided, determined and proclaimed the said town of Walnut City to be the county seat of Rush county; and that the said town of Walnut City is now the county seat of said Rush county, and has been the county seat

of said county at all times since the said election and the canvass and determination and proclamation of the result of said election, to wit, the 12th day of February, 1878.

This is, therefore, to command you and each of you that you do immediately upon the receipt of this writ remove your respective offices from the town of La Crosse to the town of Walnut City, in the county of Rush, together with all the books, records, papers and documents belonging to the same, and there remain and perform and discharge the duties of your respective offices as by law required, or show cause to the supreme court of the state of Kansas, on or before the 19th day of August, 1886, why you should not be required to do as is herein commanded.

In testimony whereof, etc.

To this writ the defendant commissioners answered as follows, omitting caption, signature, and verification:

### ANSWER.

Come now J. R. Stock, J. E. Ruhl and A. C. Lippert, commissioners of Rush county, Kansas, and defendants herein, and for their answer to the alternative writ of mandamus heretofore issued in this case, say:

That the plaintiff and relator herein ought not to have a peremptory writ of mandamus against these defendants, or either of them, for the following reasons, to wit:

I. That defendants deny each and every material allegation, matter and thing in said writ alleged and contained, except as hereinafter specifically admitted, modified or explained.

II. Defendants admit that on the 8th day of January, 1878, the board of commissioners of Rush county, Kansas, called an election for the avowed purpose of relocating the county seat of said county, which had been before that time and to wit, on the 27th day of February, 1877, by an election there for that purpose duly held, relocated at La Crosse, in said county, and at which place all the county officers of said county kept their offices from said 27th day of February, 1877, until the happening of the events hereinafter mentioned; but defendants say that the said order of the board of commissioners calling an election for the relocation of said county seat, and upon the pretended result of which election the relator relies, and which election was by said order directed to be held on the 12th day of February, 1878, was absolutely void and wholly without warrant and authority, for the reasons that the board

had no power to call the same; that no sufficient petition for the calling of such election was ever presented to said board of commissioners; that many of the names appearing upon the pretended petition that was presented were names of persons not residing in said county and not qualified voters at such election, and fictitious, and that many of the names appearing thereon were written thereon without the knowledge, authority or consent of the persons named; that the legal and requisite number of the legal electors of said county never signed said pretended petition.

That at the election held on the 12th day of February, 1878, in pursuance of the order of the board of commissioners, so unlawfully made as aforesaid, there were fraudulent votes cast in favor of Walnut City, and afterward counted in favor of Walnut City by the said board of commissioners in their canvass of the pretended votes of said election and of the pretended returns from the various voting precincts of said county, to the number of forty-five.

That there were properly offered and tendered at various election precincts in said county at said election the ballots of legal voters in said county, who desired to vote for La Crosse for county seat of said county, and which votes were, by the judges of election to whom they were so tendered, willfully, unlawfully and corruptly refused, to the number of fourteen.

That at said election illegal and fraudulent votes were cast at the precinct of Center, in the township of Center, in said county, by persons who were not legal voters, and were not entitled to vote at said election; that said illegal and fraudulent votes were cast for said town of Walnut City for county seat; that all the names of said voters appear upon the poll-books of election in said township, which names, with their respective numbers as they appear upon said poll-books, are as follows, to wit: 1 C. Mathews, 38 J. M. Anderson, 70 E. M. Cole, 15 E. M. Case, 40 G. Robinson, 6 A. Bell, 18 D. N. McChesney, 42 Wm. Lockwood, 75 B. F. Willey, 19 Francis McFadden, 44 T. D. Sutton, 76 I. H. Brown, 20 Thomas O'Brian, 49 T. P. Fisher, 77 B. F. Brown, 21 Joseph ——, 50 W. A. Fick, 78 A. J. Harburgher, 25 G. W. Cook, 59 C. H. Polk, 80 Chas. Fick, 27 L. Wolf, 61 King Blanton, 81 L. P. Jones, 32 Francis McFadden sr., 68 J. H. Gilbert, 91 M. Graham, 69 W. D. Hoyt, 36 W. H. Graham, 98 F. S. Stumbaugh, 72 J. M. Bell, 100 J. H. Kershaw, 101 Jas. S. Corbett, 102 Hiram Smith.

That there was but one precinct in said township of Center, on said 12th day of February, 1878; that the place of voting in said township was Center.

That at said election, illegal and fraudulent votes were cast at the precinct of Brookdale, in the township of Brookdale, in said county, by persons who were not entitled to vote at said election; that said fraudulent votes were cast for the town of Walnut City for county seat of said county; that the names of said illegal voters appear on the poll-books of said election for said township of Brookdale, which said names appear on said poll-books, as follow, to wit: 21 Alfred Isabelle, 28 S. Wells, 6 S. W. Riggs, 37 J. Ludings, 38 S. J. Kidd; that on said day there was but one voting precinct in said township of Brookdale.

That at said election there were illegal and fraudulent votes cast at Alexander precinct, in Alexander township, in said county, the names and numbers of which are as follow, to wit: 3 S. B. McCain, 7 B. Friedman.    That there were two voting precincts in Alexander township on said 12th day of February, 1878, to wit: Alexander precinct and Hampton precinct.

That there was misconduct, fraud and corruption in the conduct of said election in Pioneer township, in said county, on the part of the judges of the election, who were interested in having the county seat located at Walnut City, and that said judges fraudulently and corruptly conspired with other friends and partisans of Walnut City, to prevent legal voters who were desirous of voting for La Crosse as county seat, from casting their votes at said precinct; that in pursuance of such fraudulent and corrupt design, purpose and agreement said election judges did fraudulently and corruptly, and with full knowledge that such persons were entitled to vote at said election and at said precinct, reject the votes of fourteen persons who were legally qualified electors of said township, and were entitled to cast their votes at said polls at said election, which said judges well knew; that the names of the persons whose votes were so illegally rejected at said polls are as follows, to wit: Joseph Basgal, John Basgal, Abraham Hartman, Andrew Dech, John Purbuler, Molhur Borgner, Casper Holtzmeister, Anton Holtzmeister, Geo. Seitz, Joseph Basgall, John Basgall, Christopher Stegman, Martin Basgall, and Michael Meeder.

That all of said persons offered their votes at said polls while said election was in progress, and that all said persons

desired and intended to vote for said town of La Crosse as county seat of said county.

That the judges and clerks of the election at all the precincts, where fraudulent votes were cast as aforesaid, fraudulently and corruptly conspired with the friends and partisans of Walnut City, and connived at, and knowingly received said fraudulent votes, knowing them to be such.

Defendants admit that on the 16th day of February, 1878, the board of county commissioners of said county of Rush assembled as a canvassing board, and that they there and then proceeded to and did canvass the pretended result of said election, as the same appeared by the several returns of the several voting precincts of said county, and that as a result of said canvass, said board declared and proclaimed Walnut City to be the duly-elected county seat of said county, and that said board declared that the several candidates at said election had received the following total number of votes each, to wit: La Crosse, two hundred and twenty-seven votes; Walnut City, two hundred and thirty-four votes; Alexander, one vote; and that the whole number of votes cast at said election was four hundred and sixty-two.

But defendants allege the facts to be, that when said pretended petition, for the calling of said election, was presented to said board of county commissioners, said board well knew the same to be false, forged and fraudulent in the respects hereinbefore named, and that they well knew that said petition did not contain the legal and requisite number of names, legally obtained, to justify them in calling said election, and that they well knew that they had no right or authority to call said election.

That at said election a majority of said commissioners were friends and partisans of said Walnut City, and conspired at, and aided and connived at the frauds hereinbefore stated.

That at the time said commissioners canvassed said vote and returns of said election, and declared and proclaimed the result thereof, they and each of them well knew that the returns of the precincts of Center, Brookdale and Alexander contained and included the fraudulent and illegal votes hereinbefore stated; yet, well knowing such facts, they canvassed and counted all of said votes in favor of Walnut City, and that said fraudulent votes entered into and formed a part of the apparent total in favor of Walnut City, of 234 votes, as above stated, and that when said commissioners proclaimed Walnut City to be

the legally-elected county seat of said county at said election, they and each of them well knew that a majority of all the legal votes cast at said election were and had been so cast in favor of La Crosse as the county seat of said county, and that said last-named place was the legally-elected county seat of said county, which defendants allege to be the facts.

That in each and every of their said acts, a majority of said commissioners acted fraudulently, corruptly and oppressively, and with a preconceived design and purpose, on their part, of procuring the county seat to be located at Walnut City, and that a majority of them were interested in procuring the removal of the county seat to Walnut City.

That La Crosse did receive a majority of all legal votes cast at said election, and that it was the legally-elected county seat of said county at said election, if said election was of any validity.

That neither of these defendants was a member of the then board of commissioners at the time of said election, and that long prior to their being elected to office said town of La Crosse had been generally conceded to be the county seat of said county, and all of the county officers were and had been ever since the 30th day of November, 1882, continuously keeping their offices there, and the district court of said county had for a long time prior thereto been holding its regular sessions at said town of La Crosse.

That on the 27th day of February, 1877, said town of La Crosse was, by an election duly held for that purpose, duly elected and chosen to be the county seat of said county, and has ever since been and still continues to be such county seat.

That no demand was ever made upon these defendants or either of them, by the relator or by anyone authorized so to do, to remove or keep their offices elsewhere than at La Crosse, prior to this action.

III. And defendants, further answering, say : That the relator ought not to have a peremptory writ against them or either of them, for the further reasons, to wit:

That all of the matters and things asserted and claimed as against them or either of them, by the relator herein, and set forth in the alternative writ of mandamus, and the whole subject-matter of this controversy, have been and were heretofore finally determined, decided, adjudged and established as against said relator, the state of Kansas, and all other persons whomsoever, by the consideration, order, judgment and decree of the district court of Rush county, Kansas, in a cer-

tain action and proceeding duly commenced and had in the said court, wherein the state of Kansas, on the relation of one Daniel Hammond, a citizen, elector and tax-payer in the said town of La Crosse was plaintiff, against one F. E. Garner, as county clerk of Rush county, Kansas, defendant, to compel the said F. E. Garner as such county clerk to remove his office from the said town of Walnut City, where he was then unlawfully keeping the same, and to keep the same at the town of La Crosse, which last-named place the said Hammond alleged to be the county seat of said county; and in which action the said Hammond sought to and did contest the pretended election held February 12, 1878, and result thereof as declared by the county commissioners of said county in their canvass of the returns made of said election on the 16th day of February, 1878, upon which election and pretended result relator relies in this action, and as fully and finally determined, adjudged and established by the consideration, conclusion, judgment, order and decree of said district court of Rush county, Kansas, and of the supreme court of the state of Kansas in a certain other action and proceeding commenced and had in said district court, and afterward upon appeal to the supreme court of the state of Kansas, in which action and proceeding the state of Kansas, on the relation of J. V. Moon, was plaintiff, and the said F. E. Garner, as county clerk of Rush county, Kansas, was defendant in the district court, and upon appeal to the supreme court said Garner was plaintiff in error and the said Moon was defendant in error, and the record in which case is No. 2636 of causes in this court, the decision, opinion and judgment in which case by this court appears at page 790 of the 28th volume of Kansas Reports, which said action of *Moon v. Garner* was prosecuted for the purpose of enforcing the order, judgment, finding and decree of the court in the case of *Daniel Hammond v. F. E. Garner*, county clerk aforesaid.

That in the action of *Hammond v. Garner*, aforesaid, the court upon due consideration thereof found, ordered and adjudged, that the county seat of said county of Rush, at the date of the rendition of its judgment, to wit, May 31, 1878, was and is said town of La Crosse; and that the election of February 12, 1878, by a majority of the legal votes thereof, resulted favorably to said town of La Crosse; and that said defendant should, with his office, books and papers, etc., remove to and thereafter keep his office at said town of La Crosse, the county seat of said county.

That said judgment was by said court duly given, made and entered upon the records of said court in an action for the same cause as that set forth in the alternative writ in this action; and that said judgment remains in full force, virtue and effect, and has never been appealed from, or modified, or set aside.

That a copy of the alternative writ, which was duly allowed upon a proper application in said action, is hereto attached, marked "Exhibit A," and made a part of this answer; and a copy of the journal entry of judgment is also hereunto attached, marked "Exhibit B," and made a part thereof.

That in obedience to judgment of court in said action, said F. E. Garner, on or about the 3d day of June, 1878, went to La Crosse with his office, and there kept the same until about the 10th day of June, 1878, when he, in pursuance of the command of an alternative writ of mandamus issued by one of the justices of this court, returned to Walnut City with his said office. That said writ was issued in an action wherein H. Fierce, county attorney of said Rush county, was relator, and said Garner was defendant; a copy of said writ appears at length in "Exhibit D" of this answer. And that a copy of the final order and judgment of this court in said action is hereunto attached, marked "Exhibit G," and made a part thereof.

That in the action of *Moon v. Garner* aforesaid, there was an order of the district court duly made upon a sufficient showing, that the county attorney of Rush county was adversely interested in the result of said action, and that the attorney general of the state of Kansas refused to prosecute the same, allowing and permitting said Moon to prosecute said action and to become relator therein.

That the court in said action, upon due consideration thereof, found, ordered and adjudged that the judgment in *Hammond v. Garner* aforesaid was of full force, virtue and effect; that said town of La Crosse was the county seat of said county of Rush; and commanded and required said Garner, as county clerk of said county, to remove with his office, and the books, records, etc., thereof, to, and thereafter to keep his said office at, said town of La Crosse, the county seat of said county, which he had theretofore failed and refused to do.

That said judgment was duly given, made and rendered by the district court of said county of Rush, on the 21st day of March, 1882, and was then and there duly entered on the records of said court, and still remains in full force, virtue and

effect, and has never been reversed or set aside. That said judgment was rendered in an action for the same cause of action as that set forth in the alternative writ of mandamus in this action. That a copy of the alternative writ, which was allowed upon a proper showing and application in said action, is hereunto attached, marked "Exhibit C," and made a part hereof.

That a copy of the answer of the said F. E. Garner, in said action in which said Moon was relator, is hereunto attached, and marked "Exhibit F," and made a part hereof.

That the H. Fierce whose name appears in said answer is the same Fierce whose name, as a member of the firm of Fierce & Cline, appears at the end thereof as attorneys for said Garner, and that said Fierce was at all the time said action was pending the county attorney of Rush county, Kansas, and conducted the defense of said Garner. That a copy of the agreed statement of facts upon which said action was tried and decided is hereunto attached, marked "Exhibit I," and made a part hereof. That such statement and matters of record therein referred to was all the evidence that was introduced in said action.

That a copy of the journal entry of judgment in said action is hereunto attached, marked "Exhibit H," and made a part hereof.

That afterwards on, to wit, March 21, 1882, said action came on to be heard on motion of defendant for a new trial, and to set aside and vacate the judgment, which motion was by the court overruled. A copy of the journal entry of judgment made and entered upon the records of said court, overruling said motion, is hereunto attached, marked "Exhibit K," and made a part hereof. That afterward said Garner prosecuted an appeal from said judgment in the supreme court, record of which is No. 2636 in this court, and which said appeal and upon due consideration whereof said judgment of the district court set out was affirmed; see also 28 Kansas, 790. That afterward, and to wit, on the 30th day of November, 1882, in pursuance of the order and judgment of the court in said action, (and not without any authority as stated in the alternative writ herein,) the said F. E. Garner, and all other county officers of said county, moved their offices to, and that they have ever since kept them at, the town of La Crosse.

IV. And for a further answer and defense to this action, defendants say, that the relator ought not to have a peremptory writ of mandamus in this action against them, or either

of them, because the cause of action and complaint, as set forth in the alternative writ herein, if any exists in favor of the plaintiff, is barred by the statutes of limitation, because the same accrued more that two years prior to the commencement of this action, and is therefore barred by subdivision 3, §18, code of civil procedure; 2d, because the same accrued, if at all, more than three years prior to the commencement of this action, and is therefore barred by the provisions of subdivision 2, §18, code of civil procedure.

And they say that they, and their predecessors in office, have continually kept their offices at the town of La Crosse, where they now keep the same, ever since on or about the 30th day of November, 1882; and they have during that time continually asserted said town of La Crosse to be the county seat of Rush county, by virtue of an election held on the 27th day of February, 1877, and by virtue of the fact that a majority of the legal votes cast at the election held on February 12, 1878, were in favor of said town of La Crosse, and by virtue of the fact that said town of La Crosse had been theretofore, by the consideration of the district court of said county and the supreme court of the state of Kansas, and judgment thereby duly made and given, judicially determined to be such county seat. That during all of said time they openly and notoriously kept their offices at said town of La Crosse, as did all other county officers of said county, and the district court of said county, during all of said time, held the sessions of its court at said town of La Crosse.

V. And for a further defense, defendants say that the relator ought not to have a peremptory writ against them or either of them in this action, for that:

The county of Rush was organized with the county seat temporarily at Walnut City, on the — day of ——, 1874; that on the 27th day of February, 1877, at a county-seat election duly and legally held for that purpose, said town of La Crosse was, by the requisite and legal majority, chosen, elected, and by a legal and proper canvass of the votes so cast, duly ascertained and thereupon duly declared and proclaimed to be the county seat of said county.

That said result and the declaration thereof was never questioned, contested or set aside by the consideration, judgment, order or decree of any tribunal whatever; and that in pursuance thereof all of the county officers kept their offices at said town of La Crosse until on or about the 18th day of February, 1878, when, without any authority or legal right so to do

other than the proclamation of the board of county commissioners based upon the pretended result of the election of February 12, 1878, they removed their offices to Walnut City, and kept them at said place until on or about the 30th day of November, 1882, when the then county clerk, F. E. Garner, in obedience to the command of the court made and given as stated in the third ground of this answer, as the proper and legal custodian of the books, records and appliances of his office as county clerk, removed the same to, and he and his successors have ever since said date kept them at, said town of La Crosse. That it was impossible for the county commissioners of said county to hold the sessions of their board and transact their business at Walnut City while the county clerk kept his books and records at La Crosse. That the people of said county generally, and all of the county officers of said county, understood and accepted said adjudications as final and conclusive upon the question of the county seat of said county, and ever afterward considered and treated the said town of La Crosse as the county seat of said county, as has also the district court of said county. That in pursuance of and in obedience to the mandate of said decisions and the requirements of law, all other county officers of said county, on or about the 30th day of November, 1882, took their offices to, and they and their successors have ever since kept them at, said town of La Crosse, although they allege the fact to be that the majority of said officers were at that time friends and partisans of Walnut City as county seat of said county, and they say that the acts of these defendants and their predecessors in office in so keeping their office at La Crosse have during all that time been generally acquiesced in by the people of said county.

That at said election of February 12, 1878, the apparent majority of Walnut City was only six votes, and the whole number of votes cast was only 462; that of said votes, 45 were cast by persons not having the qualifications of electors, and said fraudulent votes were counted in favor of Walnut City, and were necessary to produce said apparent and pretended majority.

That since said election of February 12th a large number of people have settled in said county; that the official vote of said county as returned to the secretary of state and as appears in the records of his office, was in the years of 1884 and 1886 as follows: For 1884 said vote was 834, and for 1886, said vote was 1,675.

That said town of La Crosse is located in the geographical center of said county; that since said offices were there, to wit, and during the year 1885, the people of said county have voted a subsidy of one hundred and twenty thousand dollars, to procure the construction of a railroad through said county and to said town of La Crosse, which road has been constructed and the bonds delivered. That the business of said county, lines of travel and center of population and trade in said county are so adjusted as to render said town of La Crosse most convenient and desirable as the county seat of said county to a large majority of the people thereof.

That there has been no election for the relocation of said county seat legally called and held since that of February 27, 1877, and no other pretense of an election for such purpose except that of February 12, 1878.

Exhibits "A" to "K", inclusive, show as is alleged in the foregoing answer. Other proceedings in the case, and the material facts, are stated in the opinion, filed at the session of the court in December, 1887.

*S. B. Bradford*, attorney general, for The State; *Edwin A. Austin, H. Fierce*, and *James D. Snoddy*, of counsel.

*Ady & Henry, G. Polk Cline*, and *Hargrave & McCormick*, for defendants.

Opinion by SIMPSON, C.: A county-seat election was held in the county of Rush, on the 12th day of February, 1878. The declared result was 234 votes for Walnut City, 227 votes for La Crosse, and 1 vote for Alexander. After the result of the canvass had been declared, one Daniel Hammond, an elector of that county, commenced a proceeding in mandamus, under the provisions of chapter 79, Laws of 1871, and the amendment thereto of chapter 126, Laws of 1872, to contest such election, and to compel F. E. Garner, as county clerk of Rush county, to remove his office, books, papers and documents pertaining thereto, to the town of La Crosse, and there to keep the same. In this action, a peremptory writ was allowed on the 31st of May, 1878. The respondent being in default, exceptions were noted, and time allowed to make a

case for this court, but the action was never brought here. On the 7th day of June following, the county attorney of Rush county procured from one of the justices of this court an alternative writ of mandamus, to require Garner to keep his office at Walnut City, he having gone to La Crosse. He obeyed the alternative writ, and made return of his obedience to the court. In rendering judgment, this court ordered, as a part thereof, "that it should not conclude or be a bar to the action of any person concerning the subject-matter of the dispute therein." On the 27th day of November, 1879, J. V. Moon, a citizen and elector of Rush county, applied to the district court of that county for a writ of mandamus to compel Garner to move his office to, and keep it at, La Crosse, in obedience to the Hammond judgment. An alternative writ was issued, reciting the Hammond judgment and the authority of the relator to sue. In this action, Garner answered both by a general denial and by pleading the proceedings had in this court at the suit of the county attorney. The case was decided by the district court in favor of Moon, by holding the judgment in the Hammond case to be final and conclusive, and this judgment was affirmed in this court. (28 Kas. 790.)

This suit was commenced on the 19th day of July, 1886. It is an original proceeding in mandamus, and all the pleadings appear in the statement of the case. It was instituted by the attorney general in the name of the state of Kansas, to compel obedience to the law of the state commanding county officers to keep their offices at the county seat. For this reason, and because the state is exercising one of its sovereign powers, the court is of the opinion that the action is not barred by the statutes of limitation.

1. Mandamus; The State, not barred.

There can be no question, if the sovereignty of the state is involved, that the statutes of limitation cannot be pleaded against the state. The writer of this opinion has a very decided opinion that this action is barred by the limitation contained in the third subdivision of § 18 of the code; but the court determines otherwise, and the law of this case is, that the cause of action alleged in the alternative writ is not barred

by the statutes of limitation, for the reason that in this particular case the state, in whose name this action was instituted by its law officer, is exercising its sovereign power of compelling obedience to its statutory mandates, and cannot be estopped by a plea that the time within which obedience could be exacted has expired; that it is never too late for the state to enforce its laws. (*The State v. School District*, 34 Kas. 237.)

The case of *Sabin v. Sherman*, 28 Kas. 289, is not applicable, as that was an action between private persons, and the state was not a necessary party. In that case the maxim *Nullum tempus occurrit regi* was not relevant, but in this case it may be invoked.

In their return to the alternative writ the defendants aver—

"That all matters and things asserted and claimed as against them by the relator, and the whole subject-matter of this controversy, have been and were heretofore finally determined, decided, adjudged and established as against said relator, the state of Kansas, and all other persons whomsoever, by the consideration, order, judgment and decree of the district court of Rush county, in a certain action duly commenced in said court, wherein the state of Kansas, on the relation of one Daniel Hammond, a citizen, elector, and tax-payer in the said town of La Crosse, was plaintiff, against one F. E. Garner as county clerk of Rush county, to remove his office from the town of Walnut City, where he was then unlawfully keeping the same, and to keep the same at the town of La Crosse, which last-named place the said Hammond alleged to be the county seat of said county; and in which action the said Hammond sought to and did contest the fraudulent election held on the 12th day of February, 1878, and the result thereof as declared by the board of county commissioners in their canvass of the returns of said election, upon which election and pretended result the relator relies in this action; and that afterward, in a certain action in which the state of Kansas on the relation of J. V. Moon was plaintiff and the said F. E. Garner as county clerk of Rush county was defendant, it was established by the judgment and decree of the district court of Rush county, and afterward upon an appeal by the supreme court of the state, that the finding, judgment and decree in the case of *The State, ex rel. Hammond, v. Garner, County Clerk*, was and is final and conclusive as to the said Garner as county clerk of said county."

This plea of *res adjudicata* is fairly in the case, and must be determined. A majority of the court hold that the judgment and proceedings in the Hammond case do not conclude the relator in this case, and that the judgment, as pleaded and set forth, is no bar to this action; that while there may be some identity of cause of action, the state can interfere in matters of this kind, in the interest of peace and good order and to command obedience to its laws, and that for this purpose it cannot be concluded by suits brought by private persons to protect or enforce private rights.

*2. Private judgment. The State not bound by.*

In the case of *Garner v. The State,* upon the relation of Moon, 28 Kas. 790, it was said :

" While the statute permits any elector who considers himself aggrieved by the result of any election held for removing, establishing or relocating the county seat of a county, to contest by an action in the district court such election, yet if different actions are brought, and different judgments are rendered, it is possible that the attorney general or county attorney, in the interest of the public, might, in a proper action instituted for that purpose, have all these different judgments reviewed and superseded by a general adjudication as to which town, city or place is the legal county seat of a county, and thus bring all of the county officers, with their books, papers and records, to such town, city or place, as the county seat." (See also *The State v. Comm'rs of Hamilton Co.,* 35 Kas. 640.)

We must therefore proceed to consider the case upon its merits. To do this we must examine the record of the evidence, and determine the questions arising thereon; they are numerous, and the testimony respecting them is very voluminous. It cannot be reasonably expected that we shall recite it in detail; all we have time or disposition to do is to state its most salient features, and announce our conclusions upon them.

I. The first defense set up in the return to the writ is, tha the petition presented to the board of county commissioners of Rush county, praying for the election of February 12, 1878, was fraudulent, void, and insufficient, because there were upon said petition the names of persons who did not reside in the

said county of Rush; of those who were not qualified electors at said election; of fictitious persons, purporting to be electors of said county; of those who did not sign, or authorize anyone to sign for them; and finally, that there was not the legal and requisite number who signed the petition. There are some inherent difficulties to be overcome in the present consideration of this question. Eight years have elapsed since the signatures to the petition were obtained, and in a new, rapidly-changing and shifting population, the ascertainment of the exact facts must be accompanied with great difficulties. It is no doubt true that many of the original signers are either dead or removed from the county, and that the date of their deaths, or removal, can only be approximated. Then it must be recollected that the then board of county commissioners passed upon the sufficiency of the petition, and its determination has remained unchallenged for all this time. From the positions the county commissioners then occupied, it is fair to presume that they had a somewhat intimate knowledge of the people they represented, and of their opinions and desires upon a most important and exciting public question, and possessed better means of determining the sufficiency of the petition than can possibly be employed at this distance in time from its presentation. These things tend in a more or less degree to strengthen and emphasize the presumption that they determined correctly. Yet it is announced that there is no limitation practically to an inquiry of this character, and that the defendants in this action have the legal right to avail themselves of all fraudulent acts respecting this petition which they charge, and can establish by evidence. The *prima facie* case is against the defendants, and it is strengthened by lapse of time and long acquiescence in the declared sufficiency of the petition. They take upon themselves the burden of demonstrating by evidence the insufficiency of the petition: have they done so? A certified copy of the record of the board of county commissioners of Rush county shows a presentation of a petition for a county-seat election on the 7th day of January, 1878, and a postponement of action thereon until the

next day.   The entry of January 8 shows the presentation of another petition on that day, which the board declined to consider, and shows action and an order upon the one presented on the 7th.    The entry on the journal of the board of county commissioners on the 7th day of January shows that the petition presented on that day, and on which they subsequently ordered the election, contained two hundred and fifty-three names.    The present county clerk attaches to his evidence certified copies of the petitions: one was certified to by him on the 11th of March, 1887, and contains 241 names; the other certified to on the 24th of March, 1887, containing 243 names; the last one marked filed January 7th and 8th.   He testified that these petitions were found by him when he took charge of the office, on sheets of paper pinned together with ordinary pins.    Two additional names were added to the petition certified to on the 24th of January, which do not appear on the one certified to on the 11th.    It is true that the present clerk testified that these petitions are now in the same condition in which he found them when he entered upon the discharge of the duties of county clerk, about three years before his evidence was taken.    There is some evidence in various places in the record about these petitions, tending to show that they are, and that they are not, as they originally appeared, but it is not of a very satisfactory character.    If the petitions were thoroughly identified as being the original ones presented to the board and upon which their action was based, of course they would be primary proof of the number of petitioners, and other facts necessary to establish their sufficiency.    We cannot now go into the details of all this evidence, as our decision will be controlled by other considerations, more reliable in their nature and more satisfactory in their results.    With this view we do not care to review the evidence with respect to the two lists which are marked and filed respectively on the 7th and 8th of January, and which are now exhibits in the record.    We prefer to rest our judgment on this question in the case, on the recital in the journal of the number of the petitioners.    It was made at the time before this excitement

and contention arose, and before the election, and has remained there all these years unchallenged. It is a recital which the board had power to make, and under all the circumstances it is the best and most satisfactory evidence as to the number of petitioners. There can this be said in addition to support this view; the journal of the board on the 7th day of· January, 1878, shows that there were present Fred R. Smith, L. T. Delaplain, and Levi Cline, county commissioners, G. P. Cline, county attorney, and the county clerk; of these Levi Cline is dead, and Fred R. Smith, L. T. Delaplain and G. P. Cline are among the witnesses sworn and examined in this case. Fred R. Smith was chairman of the board at the time the petition was presented, and stated that it was canvassed and compared to satisfy the board that the legal number of petitioners had signed. The assessment rolls of the county for the year 1877, were produced, and the names on the petition were compared with those on the assessment rolls. There were more than three-fifths of the number on the assessment rolls. He could not state the number, but said that the clerk made an entry on the journal of the number of petitioners. He did not want to be understood to say that on the petition presented there were three-fifths of the same names which were on the assessment rolls of 1877, but that the number of legal electors on the petition was more than three-fifths of the number of names on the assessment rolls. The board considered the petition legal and sufficient, and ordered an election as prayed for. Smith was a strong partisan at that time of Rush Center or Walnut City, but for several years past he has resided in Wilson county. L. T. Delaplain was a member of the board, and in favor of La Crosse, and objected to the legality of the petition when it was presented. He could not remember that the board canvassed it, but said, " We knew it was our duty to do so, and we generally did what we knew to be our duty." He was produced by the defendants as a witness, but they asked him no questions as to the number of names on the petition, or as to the entry on the journal. The record of the board shows that G. P. Cline, the county attorney, was

present; and he was examined several times in this action as a witness for the defendants, but he was not asked to state anything with reference to the presentation of this petition, or the number of names upon it, or what was done by the board with reference to it.    To say the least, these omissions from the evidence of both Delaplain and Cline, as to the number of petitioners, are very suggestive of the absolute correctness of the journal.    The positive testimony of Smith, and the silence of Delaplain and Cline upon a question which they ought to have been as familiar with as Smith, greatly strengthen the view that we have taken.

Counsel for the defendants claim that such a petition, to be valid, must contain three-fifths of the identical names that are entered on the assessment rolls of the previous year; and it is said that this statute has been so construed by this court, in the case of *The State, ex rel., v. Comm'rs of Phillips Co.*, 26 Kas. 420.    This we cannot agree to, either as a statement of the law, or as a matter of judicial construction.    We do not think the statute means this, and we are very certain that this court did not so construe it in the case cited.    In that case a petition was presented to the board of county commissioners, to order an election to relocate the county seat of Phillips county; that petition contained the names of three-fifths of the number of electors in the county as shown by the last assessment rolls, but it did not contain three-fifths of the number of legal electors in the county as shown by the papers from which said assessment rolls are, or should be, made, to wit, the personal-property statements made out for the assessors by the various persons, companies, corporations, and designated listing agents.    The board of county commissioners refused to order the election prayed for, because it claimed that in determining the question as to whether or not the petition contained the requisite number of signers, it had the right to add to the last year's assessment roll the names found on property statements which were not on the assessment roll, and that by adding those names thus found on property statements, which the assessors had failed to put on the assessment rolls, the pe-

tition was not sufficient, as it did not contain three-fifths of the number of electors as were found on both of these rolls added together. Mandamus was brought against the board to compel it to order the election, on the theory that it had no right to look beyond the last year's assessment rolls in determining the number of electors in the county. This court decided, virtually, that the board had the right claimed, and refused the peremptory writ; and this was all that was decided. There is nothing in the language of the court announcing the decision which authorizes a statement that such a construction was given the statute as is contended for by counsel. The section is not susceptible of that meaning under any known rule of construction. Such a construction involves the assumption that the legislature intended to add to the constitutional qualification of voters in elections of this character, by requiring that their names should appear on the previous assessment rolls, or property statement; when all the law-making power did do, or attempt to do, was to establish a rule to aid in the determination of the number of legal electors of a county, in such a contest. "The number of legal electors shall be ascertained from the last assessment rolls;" not their qualifications, but the number of legal petitioners shall be three-fifths of the number of legal electors as shown by the assessment rolls; the petition is sufficient to authorize the order of the board. It is suggested in the brief of counsel for the defendants, that the act of 1883, § 2, chapter 91, (Comp. Laws of 1885, ch. 26, § 4,) is a declaratory act giving force and effect to the construction contended for. This is strange reasoning.

4. Statute, not declaratory. If the original section was as they claim, and this court had so construed it, what necessity would there be for the enactment of the amended section? The conclusion is irresistible that the legislature, probably in view of the fact that every county-seat election is prolific of fraud and illegal voting, endeavored to reduce such fraudulent practices to the minimum by the adoption of the new section. It must therefore be held in this case that it is no objection to the sufficiency of the petition if there appeared thereon the

The State, *ex rel.*, v. Stock.

3. County-seat election; sufficiency of petition.

names of legal electors of the county which could not be found on the assessment rolls or the property statements; if they were in truth and in fact legal voters, they had a right to sign the petition, have their names considered and counted, and to participate in the election ordered in consequence of the presentation of the petition.

We are not aided by counsel on either side by reference to pages in the record, where evidence is offered tending to show illegal signatures to the petition. We have said that the evidence satisfies us that the petition presented on the 7th of January, and acted upon by the board, contained 253 names; it is satisfactorily established that there were six names duplicated upon the petition; that it contained the name of one minor, and of one person who had not been in the county long enough. Our attention has not been called to any other illegal name on this petition, nor have we been able to find such evidence anywhere in the eleven hundred pages of the record. We therefore conclude, on this branch of the case, that the petition contained 253 names; that eight of those were illegal; that the assessment rolls and property statements for the year 1877 showed 282 names; that the petition contained the signatures of more than three-fifths of that number, and was sufficient in all respects to authorize the board to order the election of February 12, 1878.

II. The declared result of that election gave Walnut City a plurality of seven over La Crosse, and a majority of six over all competitors. It is alleged that there was a majority of the legal votes in favor of La Crosse; that certain illegal votes were cast, received and counted for Walnut City; and that certain legal electors who offered to vote for La Crosse were denied the right to vote; that their votes were not received or counted, and that, had they been permitted to exercise their right to vote, the majority would have been for La Crosse. Under the first allegation, it is claimed that forty-one persons cast illegal votes for Walnut City. As to six of those, there does not seem to have been any evidence offered tending to show that they were illegal voters; and as to one

other, there is an admission of record, that B. Friedman was a legal and qualified elector of Illinois township, and that he voted at said election; and as to one Joseph ———, whose last name is not given, it seems to be fairly established by the evidence of a witness with whom Joseph Mosseater lived and worked, that he came to Rush county in the spring of 1877, and worked for the witness over one year, and resided in Rush county at the time of the election, and for some time thereafter; and it is reasonably certain that, if this is the Joseph referred to, he was a qualified voter. Counsel for the defendants, however, seem to have limited the inquiry of illegal votes cast, to the votes of eleven persons, who will hereafter be named. As these are the only ones that are insisted to have been shown to be illegal, we may rest on the supposition that, if there had been sufficient evidence to fairly support the impeachment of other votes, counsel would not have overlooked it. The first one of the eleven is the vote of D. A. McChesney, and as he was prosecuted for illegal voting at that election, and convicted, it must be held that his was an illegal vote. Reading the testimony of John Kershner, who left Missouri about the middle of August, 1877, and was twenty-six days on the road, before he arrived and located at Walnut City, there can be no doubt but that he was not a qualified voter on the 12th of February, 1878. The evidence respecting the qualifications of Francis McFadden sr., Francis McFadden jr., and Thomas O'Brien, is very conflicting. It appears from the record that the defendants had a subpena issued for them, (they being still residents of the county,) and delivered to the sheriff, but it was never served. They ought to have been put on the witness stand by one side or the other, or some reasonable explanation given of their "conspicuous absence." We can indulge in a presumption against both sides because they were not called. James McCall swore that he took McFadden sr. to Larned on October 9, 1877, at which place he took the train for Pennsylvania, and did not return until about New Year's Day, 1878. James Baker said he sold his claim to McFadden sr. about the 25th of February, 1878; he became acquainted with

12 — 38 KAS.

McFadden sr. in the previous year, sometime between July
and October.    This witness contradicts to some extent McCall,
and disposes of his testimony.    Mrs. Baker saw McFadden sr.
in 1877, and it might have been as early as May.    G. P.
Cline said that he became acquainted with McFadden sr., his
son Francis McFadden jr., and his son-in-law Thomas O'Brien,
after the election in November, 1877; and they told him that
they had just come from Pennsylvania.    Henry Fierce saw
McFadden sr. at Fisher's in Brookdale township, in the spring
or fore part of the summer of 1877.    Fierce and another party
were building a house for Fisher, and McFadden stayed there
all night, and Fierce has been acquainted with him ever since
that time.    He is, or was, a widower, and had no minor chil-
dren.    George Butler, who did not testify very positively,
said that he saw McFadden sr. in Rush county sometime in
the year 1877.    A. H. Morris resided in Rush county since
1873; first saw McFadden sr. in the county sometime in the
early summer of 1877; it must have been in the month of
July.    This is about all the material testimony in reference
to McFadden sr., and about all that bears on the qualification
of young McFadden and O'Brien.    It is not sufficient to es-
tablish the fact satisfactorily that they were not qualified voters.
They voted; every presumption is in favor of their qualifica-
tion; the evidence is about equal, and the result is that the
charge that their votes were illegal is not sustained.    The
charge with reference to W. A. Fick and Charles Fick is in-
volved in about the same state of uncertainty by the evidence,
the evidence being a little stronger against Charles than W. A.,
but it is very unsatisfactory, and not of that character which
warrants us in pronouncing their votes illegal.    We are in-
clined to think that the vote of B. F. Brown was an illegal
one, and there is much doubt about the votes of E. M. Cole,
William Lockwood, and B. F. Willey; but conceding them to
be illegal, it does not change the result, as we shall hereafter
determine.    The very best that can be said about the illegality
of these votes is, that those of McChesney, Kershner, Stum-
baugh, B. F. Brown, E. M. Cole, William Lockwood, and

B. F. Willey, being seven in all, is fairly established; but this result can only be obtained by indulging in the utmost liberality in considering the testimony of the defendants as to the illegality of these votes.

On this evidence, there is not any reasonable doubt about the fact that the Russians, John Basgal, Joseph Basgal, Abraham Hartman, Andrew Dech, John Purbuler, Molhur Borgner, Casper Holtzmeister, George Seitz, Christopher Stegman, Martin Basgal, and Michael Madar, were not legal electors of Rush county at that election.    They all lived in Ellis county, and a part of them did not take out their first naturalization papers until after the election of February 12, 1878.    The evidence concerning these men is the most convincing of any we have found in the record, and we are able to dispose of them without any lingering doubt as to the fact that they were not legal electors of Rush county.    There is an admission in the record that one of them, George Seitz, was not a resident of Rush county; and it is also in proof that he did not file his declaration of intention to become a citizen until June, 1881; that of John Basgal was not filed until April 15, 1878; and that of Madar on the 9th day of January, 1880.

Jacob Munch, Joseph Munch, Frank Dreher, Conrad Dreher, Jacob Zimmerman, Peter Werth and Fred Werth, their number being seven, are produced, and testify that at the time of that election they lived in Hampton township, but voted at Liebenthal precinct, in La Crosse township.    The defendants contend, that in the state of the pleadings such evidence is inadmissible, and ought not to be considered by the court. It may be said that this is a very narrow and technical construction of article 33 of the code, regulating proceedings in mandamus.    Only two pleadings are allowed — the alternative writ, and the return.

"The alternative writ must state concisely the facts, showing the obligation of the defendant to perform the act, and his omission to perform it." (Code, § 690.)

"If answer be made containing new matter, the same shall not in any respect conclude the plaintiff, who may on the trial

or other proceeding avail himself of any valid objection to its sufficiency, or may countervail it by proof, either in direct denial or by way of avoidance." (§ 695.)

"No other pleading or written allegation is allowed, than the writ and answer; these are the pleadings in the case, and have the same effect, and are to be construed, and may be amended in the same manner as pleadings in a civil action." (§ 696.)

Now a concise statement of the facts showing the obligations of these defendants to remove and keep their offices at Walnut City, would be an allegation that at an election duly held in Rush county, to relocate the county seat thereof, a majority of the legal votes cast at such election was in favor of the relocation at Walnut City. The return to the writ avers that a majority of the legal electors cast their ballots for the town of La Crosse, at that election. The issue framed is, "Which place is the county seat?" (*Stoddart v. Vanlaningham*, 14 Kas. 36.) Under that issue, illegal votes for Walnut City and illegal votes for La Crosse are unquestionably admissible. Before determining the fact as to whether or not a certain number voted at the wrong precinct, we must notice a claim made by counsel for the defendants, that this fact ought to make no difference, and that such votes ought not to be excluded. Counsel ask, "When the single question was a choice for county seat, what possible difference in the result could it make where in the county a man cast his ballot?" It makes the difference of legality; the law requires a man to vote in the township or ward in which he resides; if he attempts to vote out of his township or ward, his ballot should be rejected for that reason; if he does so vote, it is an illegal one. This question has been repeatedly before the courts, and it has been universally held, that a vote cast by an elector outside of the township or ward of his residence is an illegal one. (See *McDaniel's Case*, 3 Pa. 310; Brightly Election Cases, 233; McCrary on Elections, 2d ed., 46.) Besides all this, we have a constitutional provision fixing the qualifications of voters, and one of these is, residence in the township or ward

at least thirty days next preceding the election at which he offers to vote. (Const., art. 5, §1.) Some time before the evidence upon this branch of the case was taken, the plaintiff served a notice upon the defendants that the plaintiff would offer and rely upon testimony tending to show the illegality of votes cast for La Crosse for county seat, and counted for La Crosse at Liebenthal precinct, by certain witnesses and persons, to wit, giving the names of certain persons and the number opposite their names on the poll-book of that precinct. This notice gave them a reasonable length of time in which to rebut such testimony; and while it may be that the law did not cast upon the plaintiff the service of such a notice, it is at least suggestive of fair conduct upon the part of those who gave the same. As we gather the facts from this mass of evidence, it is true that seven persons who lived in Hampton township, and should have voted there, did cast their ballots in Liebenthal precinct; and it appears circumstantially that they voted for La Crosse, as there were no votes returned from that precinct for Walnut City or any other place than La Crosse. It must be held that the seven votes cast in Liebenthal precinct for La Crosse by residents of Hampton township, were illegal. It is also established that two residents of La Crosse township voted at Liebenthal for La Crosse, when in fact they being persons of foreign birth, had not declared their intention to become citizens, and did not do so until after the election. Certified copies of their declarations are in evidence as exhibits — one dated on the 25th of February and the other on the 25th of March, 1878. It seems very probable that the votes of Karl Herklock, (Herklotz,) of Conrad Bieker and Nicholas Bieker at Liebenthal, were illegal. We are compelled to conclude that a majority of the legal electors of Rush county, at the election held therein on the 12th day of February, 1878, for the relocation of the county seat, voted for the town of Walnut City; and that the result declared by the board of canvassers, that the county seat was located at Walnut City, must be sustained.

On the question of acquiescence, it may be said that what-

ever seeming intention was expressed by the people of the county to abide by the judgment in the Moon case, was founded on the erroneous impression which prevailed throughout the county to some extent, that the judgment in the case was a final adjudication of the question and concluded all parties. The acquiescence founded on such a basis is destroyed as a legal factor in the case by the deliberate judgment of this court, that such a judgment is not a conclusive adjudication of the question.

It is recommended that the peremptory writ issue as prayed for.

By the Court: It is so ordered.

HORTON, C. J., and VALENTINE, J., concurring.


JOHNSTON, J., dissenting: I am unable to concur in the conclusion arrived at by my associates in respect to the defense of former adjudication. In my view the Hammond case, alluded to in the foregoing opinion, and decided in 1878, determined and finally disposed of the question presented in the present action. This case is brought in the name of the state, on the relation of the attorney general, against the county officers of Rush county, to compel them to remove their offices from La Crosse to Walnut City; but the real question to be determined is, which place is the county seat? The earlier case was also brought in the name of the state, upon the relation of Hammond, against a county officer to compel him to remove his office from Walnut City to La Crosse; and the only question raised there for decision was, which place was the county seat? That case was prosecuted under a provision of article 7 of the election laws, (Comp. Laws of 1879, p. 405,) which authorizes one or more of the electors of a county to use the name of the state for the purpose of contesting and having determined the question, where is the county seat? The action thus brought is not a private one, nor for the enforcement of a private right. The elector need not have an interest special or peculiar to himself, in order to institute and

prosecute the action.  By a public law he is authorized to use
the name of the state against a public officer for the adjudica-
tion of a question of public interest.  The attorney general
and county attorney may institute such an action by virtue of
the general authority conferred by the state on those officers;
but they derive their power from no higher source than did
Hammond, who was expressly authorized by the laws of the
state to maintain an action for the adjudication of the ques-
tion which is presented in the present case.  It was certainly
competent for the legislature to authorize other officers or per-
sons than the attorney general or county attorney to prosecute
such actions, and when that is done the judgment rendered
must necessarily bind the state.  For reasons which must be
regarded as sufficient, this power was conferred on the electors
of the county, and it was by virtue of this power and in be-
half of the public that Hammond was acting.  He sued in a
representative rather than a private capacity, and in a court
of competent jurisdiction, and the judgment given upon the
question involved is just as conclusive upon the state as though
the action had been brought by some other authorized repre-
sentative.  The action may be brought on the relation of one
or many electors, and against one or all of the county officers;
but whether brought by the attorney general or county attor-
ney, or an elector or many electors, and against one, several,
or all of the county officers, it is in the name of the state,
brought at the instance and on the authority of the state;
and in every case the issue to be tried is, where is the seat of
county government?   That question can be as fully examined
and determined in an action by an officer or an elector against
one officer as against all of them; and the result is just as
binding and conclusive when one elector relates as when many
do.   If nine-tenths of the electors had used the name of the
state in an action against all of the county officers, and a judg-
ment had been given declaring a certain place to be the county
seat, and requiring the officers to remove and hold their offi-
ces at such place, could the state, at the instance of some other
elector, or at the instance of the county attorney, or attorney

general of the state, reopen and retry the question thus settled ?
As well might it be said that an action prosecuted to judgment
by the county attorney for the same purpose did not preclude
the state by the attorney general from immediately commenc-
ing an action to litigate the same issue.   The location of the
county seat of Rush county was the issue adjudicated nearly
ten years ago in the Hammond case, and the judgment then
given was approved by this court.   It is the only substantial
issue presented by the state in the present action, and its de-
termination necessarily involves the same vote which formed
the subject of inquiry and decision in the Hammond case.
On the principles of *res adjudicata*, that judgment, so approved,
in my opinion ends the controversy, and for many reasons it
ought not to be disturbed at this late day.   Believing that the
state was concluded by the former adjudication, I will express
no opinion upon the other questions that have been discussed.
The peremptory writ should be denied.