No. 33,097

THE STATE OF KANSAS, ex rel. OSCAR F. PERKINS, County Attorney, *Plaintiff,* v. JOHN M. HARDWICK et al., as the Board of County Commissioners of the County of Morton, *Defendants.*

(57 P. 2d 1231)

Opinion filed May 26, 1936.

*Oscar F. Perkins,* county attorney, for the plaintiff.

*Otis S. Allen, George S. Allen* and *Raymond Briman,* all of Topeka, for the defendants.

*Clarence V. Beck,* attorney general, *J. S. Parker,* assistant attorney general, and *Harold Zimmer,* county attorney of Ford county, as *amici curiae.*

The opinion of the court was delivered by

THIELE, J.: This is an original proceeding in quo warranto.

Omitting formal allegations, the petition states that the board of county commissioners of Morton county on March 2, 1936, adopted the resolution hereafter referred to, and entered upon lands in an attempt to stop soil drifting, assessed charges for such services and entered the charges on the tax rolls of the county; that the board issued warrants for the services performed to be paid from the soil-drifting fund to be derived from taxes collected upon each piece of land upon which the board caused labor to be performed in an attempt to stop soil erosion; that the acts of the defendants are in violation of certain specified provisions of the constitution of the United States and the bill of rights and constitution of the state of Kansas; that the claimed authority under which such acts were done is Laws 1935, chapter 138; that the acts of defendants and their conduct in enforcing the provisions of such statute are without authority of law and exceed the powers and duties conferred upon boards of

county commissioners of the state of Kansas by the valid statutes thereof. There is an appropriate prayer for relief.

Defendants answering allege they have in all cases acted in accordance with the above statute, they deny it is unconstitutional, but allege it is within the police power and for protection of the lives and property of the people of Morton county, and that the action of the board in attempting to prevent soil erosion is necessary for the protection of the health and property of such citizens.

The statute under consideration was first enacted as Laws of 1913. chapter 150 (R. S. 19-2611) and affected only counties having a population of less than 10,000. It was so amended by Laws of 1933, chapter 60, special session (R. S. 1933 Supp. 19-2611), that it affected counties having a population of less than 15,000. It was then further amended by Laws of 1935, chapter 138, and then affected any county in the state. Except for the population requirement, it remains as originally enacted, and now reads:

"That the board of county commissioners of any county in Kansas is hereby authorized to devise methods and means to stop the drifting of soil in their respective counties, and to call to their assistance the state's agricultural or other experts at Manhattan and Fort Hays, and to do all that may be necessary in the judgment of the board to prevent a recurrence or continuance of such soil drifting; and said board of county commissioners may order the lands subject to soil drifting to be cultivated, plowed, ditched, furrowed, sowed or planted or handled or cared for in any other manner for the purposes expressed herein; and if any owner of lands subject to soil drifting shall fail to comply with all reasonable rules prescribed by the board to prevent soil drifting on his lands, the board may employ any person or persons to carry out their reasonable orders and to go upon all such lands for such purposes; and said board is authorized to assess reasonable charges for such services against the lands affected thereby, which charges and assessments shall be levied and collected like other taxes on real estate."

In the construction of a statute, the presumption is in favor of validity, and before it can be declared invalid it must clearly appear to be unconstitutional. (*Leavenworth County v. Miller*, 7 Kan. 479.) And in *Wulf v. Kansas City*, 77 Kan. 358, 367, 94 Pac. 207, the test of validity of a legislative act was defined in the following language:

"In determining the validity of legislative acts the following propositions have been held by this court: (1) Our constitution limits, rather than confers, power, and hence we look to it to see what it prohibits instead of what it authorizes. (*Sumner County v. Wellington*, 66 Kan. 590, 72 Pac. 216, 60 L. R. A. 850, 97 Am. St. Rep. 396.) (2) To declare an act of the legislature unconstitutional some provision must be pointed out which, either in terms or by

necessary implication, makes it so. (*Riley v. Garfield Township*, 58 Kan. 299, 49 Pac. 85.) (3) The judicial department should not interfere with the legislative conscience, unless there be a clear violation of some provision of the constitution. (*Comm'rs of Linn Co. v. Snyder*, 45 Kan. 636, 26 Pac. 21.) (4) No statute should be declared unconstitutional unless the infringement of the superior law is clear beyond substantial doubt. (*Comm'rs of Wyandotte Co. v. Abbott*, 52 Kan. 148, 34 Pac. 416.)" (p. 367.)

On behalf of the defendants, it is urged the act is within the police power, and for our purposes that may be conceded. But the exercise of the police power must be under constitutional limitations. Although not clearly set forth in the petition, it is argued the act delegates legislative power to the board of county commissioners contrary to the provisions of our constitution. The three branches of government as outlined in our federal constitution were kept separate and apart in our state constitution. Under the delegation of powers—and all not delegated remain with the people (Bill of Rights, § 20)—the legislative power was vested in the legislature by article 2, section 1 of our constitution, there being certain provisions for delegation thereof, among them being article 2, section 21, reading as follows:

"The legislature may confer upon tribunals transacting the county business of the several counties, such powers of local legislation and administration as it shall deem expedient."

and article 12, section 5, which recites:

"Provision shall be made by general law for the organization of cities, towns and villages; and their power of taxation, assessment, borrowing money, contracting debts and loaning their credit, shall be so restricted as to prevent the abuse of such power."

In *City of Emporia v. Smith*, 42 Kan. 433, 22 Pac. 616, it was contended the legislature was without power to delegate certain matters of local legislation to a city of the second class, and it was there said:

"The pith and marrow of the first proposition is, that in accordance with section 21, article 2, of the constitution of this state, the board of county commissioners is the only body to which the legislature can delegate the power to extend the limits of a city of the second class. That section reads: 'The legislature may confer upon the tribunals transacting the county business of the several counties such powers of local legislation and administration as it shall deem expedient.' This language is too plain to admit of misconstruction, or to cause any diversity of opinion to arise in the minds of lawyers as to its meaning. Under this section the legislature may, if it deem it expedient, confer upon the tribunals transacting the county business, such local legislative and administrative powers as may aid in the transaction of the business of the

various counties. The attorney for the defendant in error would have it read, that the legislature shall confer upon the tribunals transacting the county business, *all* powers of local legislation and administration. Under the section as we construe it, only such local legislative and administrative powers as pertain to the transaction of county business can be conferred, and only such of these powers as the legislature may deem it expedient to confer." (p. 435.)

(See, also, *Hutchinson v. Leimbach,* 68 Kan. 37, 74 Pac. 598, and the concurring opinion of Burch, J., on rehearing, in *Bank v. Laughlin,* 111 Kan. 520, 526, 207 Pac. 433.)

It thus appears that under certain circumstances the legislature does have power to delegate legislative powers, and this power has been recognized in conferring on cities powers of local regulation, in providing for drainage districts, and in creation of boards and commissions authorized to administer and execute certain specific powers. In some instances, the delegated powers are effective and exercisable only upon compliance with precedent conditions, such as are prescribed in various drainage district acts. (See the various statutes, and, also, *State, ex rel., v. Drainage District,* 123 Kan. 191, 254 Pac. 372, and the statutes and decisions respecting the herd law, among them being *Noffzigger v. McAllister,* 12 Kan. 315.) In other instances the delegation of power to an administrative board has been upheld where the statute provided for the promulgation of rules and regulations which had the force of law. Instances are: the insect-pest law (Laws 1907, ch. 386, R. S. 2-701 *et seq.*), upheld in *Balch v. Glenn,* 85 Kan. 735, 119 Pac. 67, the livestock laws (R. S. 47-601 *et seq.*), and various public-health measures in chapter 65 of the Revised Statutes, as amended, and other instances could be cited.

It will be observed that where power has been delegated to a board or commission created by the legislature, the powers conferred result in a uniform operation over the state, limited by the authority granted by the creating statute. It will also be observed that all of these powers may be said to be granted by reason of reserved powers and not in violation of any limitation placed upon the legislature by the constitution. Insofar as a county tribunal is concerned, the legislature is limited; it can confer only power of local legislation. With that in view, we look to the statute under consideration.

Is soil drifting a local matter and subject to local legislation? Defendants call our attention to authorities upholding legislation for cutting of weeds, for removal of snow and ice, etc., as being matters of local legislation, and proper exercise of the police power. The delegation of power to cities to legislate on these matters, even

though they be of local character, is dependent not on that characteristic, but because of the provisions of article 12, section 5 of our constitution authorizing the legislature to make provision by general law for the organization of cities, towns and villages, and that it has done. (See chapters 12, 13, 14 and 15 of the Revised Statutes.) Therefore, many decisions upholding the power to legislate with respect to matters of the kind mentioned are not controlling here.

As we view it, the matter may be considered from two angles—one the evil or wrong which it was proposed to remedy, the other the field of operation of the statute. Webster's International Dictionary (2d ed.) defines the verb "drift" thus:

"1. To float or be driven along by or as by a current of water or air: . . .
"2. To accumulate in heaps by the force of the wind; to be driven into heaps, as snow or sand drifts."

And it is rather obvious the statute under consideration was intended to prevent drifting as caused by wind and not by water, and this is made certain by a reference to the map of Kansas and to our census figures. At all times since the statute was first enacted, there have been west of the sixth principal meridian, or roughly speaking, the west two thirds of the state, sixty-three of our hundred and five counties. In 1913, of these sixty-three counties thirty-five had less than ten thousand population, and, in 1933, when the statute was amended, fifty-one of them had less than fifteen thousand. In 1913, in the eastern one third of the state, comprising forty-two counties, only one had less than ten thousand population, and in 1933 only eleven had less than 15,000. Bearing in mind the eastern part of the state has more rainfall and more and larger streams than the western part, it must be apparent that drifting from wind effect was the evil to be remedied rather than any erosion caused by water. And this is even more apparent from the language of the statute that affected lands are to be "cultivated, ditched, furrowed, sowed or planted," etc. While it may be possible that an isolated tract of land might be subject to wind erosion and consequent drifting of soil, it is apparent that the statute was not enacted with that sort of a situation in view.

It requires no deep study of meteorology to learn of the prevailing winds, especially in the western part of this state, and that they pervade wide areas. In early days when the land was covered with native grasses, the tendency of the wind to blow loose soil did not produce the drifting that came when the sod was plowed under

and the lands were cultivated. As settlement progressed the amount of cultivated land increased, and effects of wind became more pronounced. The great increase in cultivation, coupled with extremely dry seasons, caused dust storms, and means and methods of lessening undesirable effects received attention. It does not seem to need much consideration of the matter to perceive that the situation was not of local character in any respect, but affected a wide area, not limited even to the state of Kansas. This is recognized by the statute which authorizes the board of county commissioners to call upon the state's agricultural and other experts at Manhattan and Fort Hays for assistance.

The statute requires the board to prescribe rules which must be complied with, a clear delegation of legislative power, and of power to legislate on a matter which is not local and is forbidden by the constitution. In our judgment, the evil to be eradicated and the injury to be remedied come not from any local situation nor from any county situation, but from one that is almost state-wide and that cannot by any fiat of the legislature be limited in its scope. The attempted delegation of power to legislate violates the provisions of our constitution.

The statutory requirement of the landowner is "to do all that may be necessary in the judgment of the board to prevent a recurrence or continuance of such soil drifting." Under this delegation, each county may set up its own standard, and this is more clearly discernible from the fact that the remaining portions of the statute set no standard whatever by which the local board of commissioners is bound to act. Boards in adjoining counties may prescribe widely varying standards or no standards at all, for compliance with the act is not mandatory. To deal with such a situation, the act must be general in its application and of uniform operation, otherwise it cannot stand. (Const. art. 2, sec. 17.) This act is one of a general nature, but so drawn that by reason of the delegation of power to legislate there is a lack of uniform operation throughout the state.

In view of our conclusions, we need not discuss the claimed invalidity of the statute under other clauses of our state or national constitutions.

Were we to hold the statute a valid enactment, it would not alter our conclusion as to the final disposition of this case. While it is discretionary with the board of county commissioners whether it proceed under the act, before it is authorized to employ persons to

carry out its orders, the owner must have failed to comply with all reasonable rules prescribed by the board to prevent soil drifting. The resolution adopted by the defendant board prescribed no standard whatever; it urged all owners and tenants to list affected lands and provided that where the landowners could not or would not, when proper complaint was made, it would employ such measures as might be necessary to stop soil drifting, and would charge the costs to the land upon which the work was done. Complaint was made concerning land owned by one Drew. Under instruction of the board of county commissioners, the county clerk sent Drew a notice the board had been advised the land had been reported to be subject to soil drifting caused by winds and that unless Drew took immediate action to correct it, the county would be compelled to proceed under the above-mentioned statute, the cost to be charged as taxes. Drew ignored the notice and the board employed one Renshaw to do the work, the exact nature of which is not disclosed, and thereafter issued to him a warrant which was presented to the county treasurer and stamped "not paid for want of funds." The resolution was not sufficient in that it prescribed no standard of action, and the notice was no more specific. What the landowner was to do was not ascertainable, either by the resolution of the board, which perhaps was intended as the reasonable rules mentioned in the statute, or by the notice given Drew, and when Renshaw entered upon Drew's land he either got further orders from the board or did whatever he personally thought needed to be done to stop the soil drifting. This procedure certainly did not comply with the statute, if it were otherwise valid. Neither did the statute provide for the issuance of a warrant, nor was there any fund from which to pay it. The issuance of the warrant was in violation of the cash-basis law. (Laws 1933, ch. 319, R. S. 1933 Supp. 10-1101 *et seq.*)

We conclude the board of county commissioners is and has been acting without lawful authority in the premises, and that it should be and it is ousted from acting under the provisions of Laws 1935, chapter 138.