No. 33,357

Seth C. Lemons, *Plaintiff*, v. W. C. Noller et al., as the Board of County Commissioners, and as the County Canvassing Board of Shawnee County; Ernest L. Newman, County Clerk, and Naoma Combs, *Defendants*.

No. 33,358

Jesse C. Underwood, *Plaintiff*, v. W. C. Noller, Leah B. Willcuts et al., *Defendants*.

(63 P. 2d 177)

Opinion filed December 30, 1936.

*E. R. Sloan, W. Glenn Hamilton, Randal C. Harvey, J. Glenn Logan* and *Clarence Malone,* all of Topeka, for the plaintiffs.

*Lester M. Goodell, Frank P. Eresch, A. Harry Crane, Walter T. Chaney, Edward Rooney* and *Thomas Amory Lee,* all of Topeka, for the defendants.

*Clarence V. Beck* and *Theo. F. Varner,* both of Topeka, as *amici curiae.*

The opinion of the court was delivered by

THIELE, J.: In each of the above-entitled actions the plaintiff has filed in this court his motion for a writ of mandamus to compel the defendants named, as constituting the canvassing board, to issue to him a certificate of election to the particular office hereafter mentioned. The basis of each plaintiff's claim is that the ballots of absentee voters, both within and without the state, should not be counted for the reason that the statutes conferring the right to vote on qualified electors absent from home but within the state, appearing as R. S. 25-1001 to 25-1008, inclusive, and conferring the right to vote on qualified electors absent from home and without the state, appearing as R. S. 25-1101 to 25-1113, inclusive, as amended by R. S. 1933 Supp. 25-1101 *et seq.* are unconstitutional. Upon the filing of the motions we made a rule to the defendants to show cause why the writs should not be granted, and answers thereto have been filed.

Although objections are made to the right of the plaintiffs to maintain these particular actions which, if ruled on, might dispose of them, owing to the fact that a decision as to the constitutional questions raised is of state-wide importance, we have concluded in this instance to proceed to a discussion thereof, our action in so doing, however, not to be considered as any precedent whatsoever that proceedings in mandamus may be substituted for a proceeding to contest an election, in quo warranto, or any other proper remedy.

We note, also, the denials of defendants that plaintiffs received the number of votes hereafter mentioned, but for the purpose of

disposing of the constitutional question we assume the statements in the two motions as to the number of ballots counted for each candidate, and subsequently canvassed by the canvassing board, are correct.

In the Lemons case it is alleged that Lemons and Combs were opposing candidates for the office of register of deeds of Shawnee county, and that the board canvassed the pollbooks showing those personally present and voting, and counted the ballots of electors absent from the county but within the state, and counted the ballots of electors absent from the state, with the following results:

|  | Lemons | Combs |
|---|---|---|
| Personally present and voting | 20,482 | 20,397 |
| Absent, but within the state | 22 | 40 |
| Absent from the state | 113 | 213 |
| Totals | 20,617 | 20,650 |

In the Underwood case it is alleged that Underwood and Willcuts were opposing candidates for the office of clerk of the district court of Shawnee county, and the results were as follows:

|  | Underwood | Willcuts |
|---|---|---|
| Personally present and voting | 20,060 | 20,048 |
| Absent, but within the state | 16 | 40 |
| Absent from the state | 117 | 206 |
| Totals | 20,193 | 20,294 |

From the above it may be observed that if the absentee ballots should not be included each plaintiff would have been elected. In the Lemons case, if both acts are constitutional, plaintiff cannot prevail. In the Underwood case, if one of the absentee acts is constitutional and the other unconstitutional, plaintiff cannot prevail.

We pause here to note that in the briefs there is discussion of the fact that in the Underwood case the office is one created by the constitution, while in the Lemons case the office is one created by the legislature, and an argument is predicated on the power of the legislature to fix the qualifications of voters at elections for other than constitutional offices, even though the absentee-voters laws may be unconstitutional as applied to constitutional officers. (See *Wheeler v. Brady,* 15 Kan. 26.) There is also some argument based on the proposition that if such a distinction is upheld to its full extent in the Lemons case, we should then consider whether or not the legislature would have passed the absentee-voters laws which would

affect only offices created by the legislature and be nullities insofar as constitutional offices are concerned. We also note the fact that with reference to the election of United States senators and representatives there is provision made by the United States constitution (art. 1, sec. 4, cl. 1) that the time, place and manner of their choosing shall be prescribed in each state by the legislature thereof, and that with reference to presidential electors, they shall be appointed in such manner as the legislature may direct. In view of our conclusions, however, it is not necessary that we discuss the distinctions that might arise in the three instances, nor legislative results that might have followed had the legislature proceeded on the theory that it was passing absentee-voters laws with reference only to a part but not all offices to be filled at the election. Neither will it be possible for us to take up and discuss, distinguish and compare the many citations of authority in the exhaustive briefs filed by counsel for both plaintiffs and defendants.

The bill of rights of our constitution has two provisions to which attention is directed. The second section provides that:

"All political power is inherent in the people, and all free governments are founded on their authority, and are instituted for their equal protection and benefit. No special privileges or immunities shall ever be granted by the legislature, which may not be altered, revoked or repealed by the same body; and this power shall be exercised by no other tribunal or agency."

The twentieth section provides:

"This enumeration of rights shall not be construed to impair or deny others retained by the people; and all powers not herein delegated remain with the people."

In *Atchison Street Rly. Co. v. Mo. Pac. Rly. Co.*, 31 Kan. 660, 3 Pac. 284, this court, speaking through Brewer, J., said that the bill of rights is something more than a mere collection of glittering generalities.

The right of the legislature to enact statutes of varying purposes as being in contravention of specific provisions of our constitution has been before this court in many instances. In *Prouty v. Stover, Lieut. Governor*, 11 Kan. 235, the question before the court was the effect of the amendment with reference to the state printer and the manner of his election (art. 15, sec. 4, as amended in 1868), in connection with a previous act of the legislature of 1861 with reference to proceedings of the legislature when in joint session. In discussing inhibitions on the legislature by reason of constitutional provisions, it was said:

"To sustain an implied inhibition there must be some express affirmative provision. The mere silence of the constitution on any subject cannot be turned into a prohibition. Take the illustrations cited. Were the constitution silent as to the qualifications of voters, that silence would not by implication or otherwise restrain the legislature from prescribing them. The power of the legislature to prescribe them would be unquestioned. Again, to sustain an implied inhibition, the express provision must apply to the exact subject-matter, and the inhibition will not be extended further than is necessary to give full force to that provision. Pursuing the same illustration, a mere registry law will not come within the implied inhibition, even though it require the voter to do some acts to establish his right to vote, and though it frequently operate to deprive a legal voter of his vote. Such a law is concerning the general subject of voting and elections, but it does not reach to the exact matter of qualification; and, on the other hand, full force can be given to the constitutional provision without interfering with the law. To declare a law void as conflicting with an express provision of the constitution, the conflict must be clear. So say all the authorities. None the less clear must the conflict be when it is conceded that no express provision has been violated, and only claimed that some negation must be implied from the affirmative language of the constitution which is irreconcilable with the law." (p. 256.)

In *Sumner County v. Wellington,* 66 Kan. 590, 72 Pac. 216, where the right of the legislature to increase exemptions from taxation over those specified in the constitution was under consideration, it was said:

"Our constitution limits, rather than confers, power, and, hence, we look to it to see what it prohibits, instead of what it authorizes." (p. 593.)

In *Jansky v. Baldwin,* 120 Kan. 332, 243 Pac. 302, where the statute providing conditions of eligibility for the office of county superintendent was claimed to be unconstitutional, the power of the legislature was concisely stated in the following language:

"Perhaps this analysis will clarify the situation: Under our form of government all governmental power is inherent in the people. Some governmental powers are delegated to congress, or to the federal government, by our federal constitution; those not so delegated are retained by the people. Hence, congress has no legislative power not granted to it by the federal constitution. This is not true of a state constitution. Since the people have all governmental power, and exercise it through the legislative branch of the government, the legislature is free to act except as it is restricted by the state constitution, and except, of course, the grant of authority to the federal government by the federal constitution. Our constitution (art. 5, §§ 2, 5 and 6) has placed certain restrictions upon the right of suffrage and the right to hold office. So long as a legislative act does not infringe upon those restrictions, it cannot be said to be unconstitutional. (*Ratcliff v. Stock-yards Co.,* 74 Kan. 1, 16, 86 Pac. 150; *State v. Weiss,* 84 Kan. 165, 168, 113 Pac. 388.)" (p. 334.)

Recognizing the fundamental correctness of the conclusions above expressed, this court in various decisions formulated rules for determining validity of acts of the legislature, those rules being well expressed in *Wulf v. Kansas City*, 77 Kan. 358, 94 Pac. 207, where it was said:

"In determining the validity of legislative acts the following propositions have been held by this court: (1) Our constitution limits, rather than confers, power, and hence we look to it to see what it prohibits instead of what it authorizes. (*Sumner County v. Wellington*, 66 Kan. 590, 72 Pac. 216, 60 L. R. A. 850, 97 Am. St. Rep. 396.) (2) To declare an act of the legislature unconstitutional some provision must be pointed out which, either in terms or by necessary implication, makes it so. (*Riley v. Garfield Township*, 58 Kan. 299, 49 Pac. 85.) (3) The judicial department should not interfere with the legislative conscience, unless there be a clear violation of some provision of the constitution. (*Comm'rs of Linn Co. v. Snyder*, 45 Kan. 636, 26 Pac. 21.) (4) No statute should be declared unconstitutional unless the infringement of the superior law is clear beyond substantial doubt. (*Comm'rs of Wyandotte Co. v. Abbott*, 52 Kan. 148, 34 Pac. 416.)" (p. 367.)

And the rule there stated was approved and applied in *State, ex rel., v. Hardwick*, 144 Kan. 3, 57 P. 2d 1231.

In determining the force and effect that is to be given to constitutional provisions, consideration must be given to the history that led to their adoption, and any subsequent changes that may have been made. In the case of *Leavenworth County v. Miller*, 7 Kan. 479, where the constitutionality of railroad-aid acts was involved, it was said:

"But with reference to this particular statute the strongest rule in favor of its constitutionality should be adopted. All presumptions are in favor of its validity. It was not passed through the hurry and bustle of hasty legislation; nor through inadvertence or oversight; nor through whim or capricious fancy; nor through the influences of party drill or party machinery; nor through chicanery, fraud, or corruption; but it was passed after due deliberation and discussion. Besides, it is not an isolated statute, standing alone in questionable solitude upon the statute books of Kansas. Two thirds of the legislatures of the Union have passed similar statutes, and two thirds of the highest judicial tribunals of this country have declared them to be constitutional. And further, this statute in substance, though in some respects modified, still remains upon our statute book, although it has passed the scrutiny of six subsequent legislatures since its first adoption. It has, of course, been declared and repeatedly declared constitutional by the legislative and the executive branches of the state government, for it has repeatedly obtained their sanction and approval. This, to begin with, is certainly very strong evidence in favor of its constitutional validity. It will be conceded that the constitution does not anywhere in definite and precise terms authorize the passage of said act, and it will be

conceded that unless such authority is given by section 1, article 2 of the constitution it is not given at all. Said section reads as follows:

" 'Section 1. The legislative power of the state shall be vested in a house of representatives and senate.'

"The question then resolves itself into this: Was the passage of said act the exercise of legislative power? If it was, the act is, of course, constitutional; but if not, then the act is certainly unconstitutional." (p. 499.)

When the constitutional convention of Kansas met in 1859, its members were well aware that a determined effort was being made by the antislavery and proslavery forces to dominate the form of government of the then territory, everyone recognizing that it was only a question of time until the population would increase and statehood would come. There was more than mere political conflict; there was guerilla war. Such elections as were had were held under difficulty and each side accused the other of procuring votes from persons not entitled. The situation was such that troops were maintained in the territory. When the constitutional convention was in session there was spirited debate as to whether soldiers should, under any circumstances, be permitted to vote. (Wyandotte Const. Conv., pp. 296, 304, 512.) The final result as submitted to the people and adopted was embodied in article 5, section 3, and read as follows:

"No soldier, seaman or marine in the army or navy of the United States, or of their allies, shall be deemed to have acquired a residence in the state in consequence of being stationed within the same; nor shall any soldier, seaman or marine have the right to vote."

The constitution as adopted and the subsequent admission of Kansas into the Union settled the slavery question so far as whether Kansas was to have slavery. Shortly thereafter the Civil War broke out, and many of the electorate joined various military units and under a plausible reading of the section were deprived of their votes. It is now beside the question whether an otherwise qualified voter lost his right to vote merely because he entered the military service. But in 1863 and again in 1864, Governor Carney, in his messages to the legislature, called attention to the situation, and in 1864 an amendment was proposed and at the general election in 1864 adopted, which reads as follows:

"For the purpose of voting, no person shall be deemed to have gained or lost a residence by reason of his presence or absence while employed in the service of the United States, nor while engaged in the navigation of the waters of this state, or of the United States, or of the high seas, nor while a student of any seminary of learning, nor while kept at any almshouse or other asylum

at public expense, nor while confined in any public prison; and the legislature may make provision for taking the votes of electors who may be absent from their townships or wards, in the volunteer military service of the United States, or the militia service of this state; but nothing herein contained shall be deemed to allow any soldier, seaman or marine in the regular army or navy of the United States the right to vote."

Plaintiff's claim that the absentee-voters laws of this state, to which reference has been made, are unconstitutional, is based principally upon the ground that under the above amendment the right to pass absentee-voters laws is limited to extending the right to vote to electors absent from their townships and wards and in the volunteer military service, and that by implication the right so to vote is denied all others. It is also argued that article 5, section 1, requires personal presence of the elector in the township or ward at which he offers to vote, and that article 4, section 1 requires secrecy of the ballot and vote and the absentee-voters acts under consideration violate these provisions.

Under the first of these claims it is not necessary that we notice any particular provision of the acts, for either the legislature had or had not the power to extend the privilege of absentee voting to others than soldiers. Putting aside for the time being any argument turning on the claimed requirements of personal presence and secrecy of vote, it is quite clear that in the constitution as originally adopted there was no provision expressly referring to absentee voting nor was there any provision from which any inhibition could be implied. We think it quite clear that had an absentee-voters law been passed prior to the amendment of article 5, section 3 of the constitution in 1864, it would have been within the legislative power.

Attention has been directed to the circumstances under which the original section was adopted, as well as to the amendment. The language of the first part of the section, the manner of its arrangement, and the thought which it ordinarily conveys is that the purpose was to protect the suffrage by providing that the right to vote should not be gained or lost by reason of the status of the elector in enumerated instances. In the latter part of the section, bearing in mind the provisions of the section sought to be amended, and previously considered as denying one in the voluntary military service the right to vote, is an express provision conferring upon him such a right and authorizing the legislature to extend to him the right to vote when absent from his township or ward. The provision as to soldiers, seamen or marines in the regular army contained in the

amendment was to a considerable extent a reiteration of the original section insofar as they were concerned.

In *Hunt v. Richards,* 4 Kan. 549, the question was whether Hunt, who possessed all the qualifications of a voter, was debarred from voting by the mere fact he was an officer in the regular army of the United States. In holding that he was entitled to vote, it was said:

. "We are clear that the only provisions ever contained in the constitution of Kansas, which could fairly be deemed to have that effect, was the anomalous clause we have quoted, which was abrogated by the amendment of 1864. And perhaps it is not too much to suppose that the apparent inconsistency of disfranchising educated and patriotic native-born citizens for no other reason than that of being in the military service of the country; while at the same time 'every white male person of twenty-one years and upwards,' whether citizen or inchoate citizen, was admitted to exercise the right of suffrage, was one of the grounds on which the legislature proposed, and the electors ratified the amendment.

· "That amendment, as it seems to us, contains all the restrictive provisions necessary to prevent officers or soldiers of the army, stationed within the limits of our state, from acquiring a right to vote here while having homes elsewhere, or having no homes anywhere except the quarters or barracks provided by the government.

· "We conclude that a white male person of twenty-one years or upwards, being a citizen of the United States, or having declared his intention to become such, as required by law, who has resided in Kansas six months next preceding any election, and in the township or ward in which he offers to vote, at least thirty days preceding such election, is a legal voter in Kansas; notwithstanding he may be an officer or soldier in the army of the United States; provided, always, that he shall not be deemed to have gained a residence for the purpose of voting, by reason of his presence while employed in the service of the United States.

"As the plaintiff in error is admitted to have had all of the required qualifications at the time his vote was refused, the judgment of the court below must be reversed." (p. 553.)

While the question of absentee voting was not involved in the above case, it is clear the amendment was construed as applying to losing or gaining a residence for the purpose of voting, and not as applying to qualification of the voter.

May it be said that the provision for taking the votes of absent volunteer soldiers is a denial of the power to extend such a right to others? In *Bank v. Laughlin,* 111 Kan. 520, 207 Pac. 433, the question involved was the effect of a constitutional amendment with respect to liability from ownership of stock in a corporation, on a statute expressly creating such a liability, it being claimed the amendment repealed the statute. In a concurring opinion by Burch, J., after reference is made to certain of our decisions, it was said:

"Restrictions are not to be lightly inferred. They are not to be derived from axioms, or from supposed fundamental principles, or from conceptions of the essential nature, of constitutional government. (*Wulf v. Kansas City,* 77 Kan. 358, 94 Pac. 207.) There must be some provision of the constitution itself which abridges legislative power. Abridgment may be express, or may be implied. One form is as potent as the other, but abridgment by implication must be as plain as express abridgment, and in order that this may be so, the implication must arise from an express provision. When an express provision relating to some subject of legislative cognizance is found, the provision is to be given full effect, but it will not be extended further than necessary to give it full effect, and the legislature is at liberty to deal with all phases of the subject not clearly covered by the provision. All this was said in the opinion of the court formulated by Justice Brewer, in the case of *Prouty v. Stover, Lieut. Governor,* 11 Kan. 235, the syllabus of which reads:

" 'Constitutional inhibitions need not always be express. They are equally effective when they arise by implication. To create an implied inhibition there must be some express affirmative provision. The mere silence of the constitution creates no prohibition. To sustain an implied inhibition, the express provision must apply to the exact subject-matter, and the inhibition will not be extended further than necessary to give full force to the provision.' (¶ 3.)" (p. 525.)

A consideration of original article 5, section 3, and the circumstances leading up to its submission and adoption, the purposes intended by its amendment, and the language of the amendment, leads us to the conclusion that the principal purpose was not in any manner to change the qualifications of electors, but only to extend the original provisions with respect to gaining or losing residence for the purpose of voting, to remove the restriction on voting of those engaged in the volunteer military service, and to extend to them a right which certainly prior thereto the legislature could have extended to others of the electorate, *i. e.,* of voting when absent from the township or ward in which they resided. The grant of power so to legislate with respect to volunteer soldiers is affirmatively expressed; there is nothing about it which leads to a conclusion that a right previously existing in the legislature was to be taken away. We conclude the amendment did not deprive the legislature of power to enact statutes authorizing the taking of votes of qualified electors when absent from their townships or wards, and that if our statutes herein referred to are unconstitutional it must be for reasons other than the provisions of article 5, section 3 of our constitution.

Plaintiffs further contend that by reason of article 5, section 1 of our constitution, in order for an elector to vote, he must be personally present within his township or ward when the election is held. That section reads:

"Every citizen of the United States of the age of twenty-one years and upwards—who shall have resided in Kansas six months next preceding any election, and in the township or ward in which he or she offers to vote, at least thirty days next preceding such election—shall be deemed a qualified elector."

The above section is an amendment made in 1918 of the section as originally adopted, but the changes made do not have any bearing on the question now before us. Plaintiffs' argument turns on the phrase "in the township or ward, in which he or she offers to vote," it being contended that this requires personal presence of the voter at the polls in the township or ward where the elector resides. We here observe that in other states having provisions more or less similar to ours, different conclusions have been reached in determining the constitutionality of absentee-voters acts.

In *Lancaster City's Fifth Ward Election*, 281 Pa. St. 131, 126 Atl. 199, 35 A. L. R. 815, the first paragraph of the headnote, as shown in the last citation, is as follows:

"The legislature cannot provide for general absentee voting where the constitution provides that the elector shall have resided in the district 'where he shall offer to vote' a specified time preceding the election, and contains a special provision for absentee soldier vote."

For a critical note on the above case, see 73 University of Pennsylvania Law Review, page 176.

In *Jenkins v. Board of Elections*, 180 N. C. 169, 104 S. E. 346, 14 A. L. R. 1247, the first and eighth paragraphs of the headnote, as shown in the last citation, are as follows:

"A statute providing for voting by absentee voters does not violate the constitutional provision that election shall be by ballot."

"A constitutional provision that every person offering to vote shall be a legal resident of the election district does not require his personal presence in the district when the offer is made, but it may be made in writing."

And appended to both of the above reports in A. L. R. are extensive notes on the validity, construction and effect of absentee-voters laws, which show diversity of holding, depending to some extent on provisions of the constitutions of the several states, as well as on the terms and provisions of the laws under consideration. Time and space do not permit of a résumé of the various decisions; they cannot be reconciled in all particulars, and while persuasive, they are not controlling. In some of the states the constitutional provisions with respect to elections and the conduct thereof, as well as with respect to suffrage, are more detailed than are the provisions of our constitution.

Our constitution provides that all elections by the people shall be by ballot (art. 4, sec. 1), and fixes the date of the general election (art. 4, sec. 2), but is otherwise silent as to the conduct of elections. Under the article with respect to suffrage, it defines who is a qualified elector in the language above quoted (art. 5, sec. 1), states who is disqualified from voting (art. 5, sec. 2), and makes provision as to gaining or losing residence for the purpose of voting as above quoted (art. 5, sec. 3), and article 5, section 4, provides:

"The legislature shall pass such laws as may be necessary for ascertaining by proper proofs, the citizens who shall be entitled to the right of suffrage hereby established."

The other sections of articles 4 and 5 are not pertinent to this discussion of elections and who may vote. It thus appears that the constitutional convention left much to the discretion of the legislature. It is argued that article 5, section 1, fixes the qualifications of an elector, and that is conceded, but it is also argued that it requires personal presence at the polls on election day, and that an absentee-voters law necessarily violates that provision, in that it relieves the voter of complying with a constitutional requirement. The converse of this argument was made in State v. Butts, 31 Kan. 537, 2 Pac. 618, where the registration act of 1879 was attacked as being unconstitutional, in that it placed an additional qualification on the suffrage. While in that case weight was put on article 5, section 4, the question of additional qualifications was discussed, and it was held that requiring registration at least ten days before the election was within the legislative power. In discussing the question, the court, speaking through Brewer, J., said:

"It is true isolated instances may occur where a party through absence or sickness is unable to register, and so loses his vote, but the same result may follow where any failure to produce the required evidence occurs. A naturalized foreigner may lose his naturalization papers, and the court where he was naturalized may be at the very extreme of the land, and so, for lack of the legal evidence of his naturalization, he may lose his vote; but still in both cases, the matter is simply one of a lack of evidence. It is a mistake to suppose that there is any special virtue in the mere day of election. If the legislature has the right to require proof of a man's qualification, it has a right to say when such proof shall be furnished, and before what tribunal; and unless this power is abused the courts may not interfere." (p. 555.)

In State, ex rel., v. Stock, 38 Kan. 154, 16 Pac. 106, the question did not involve any absentee-voters law. There in a county-seat election certain persons who were qualified electors in one township voted in another township in which they did not reside. It was held:

"An elector must vote in the township or ward in which he has resided, at least thirty days next preceding the election at which he offers to vote. If he attempts to vote out of the township or ward of his residence, his ballot should be rejected. If he does so vote, it is an illegal one." (Syl. ¶ 6.)

The first absentee-voters act appears in G. S. 1868, chapter 36, article 4, and is limited to qualified electors absent from their township and ward, employed in the militia or volunteer service of the state or United States. This statute has been amended in some particulars and now appears as R. S. 25-1201 to 25-1212, inclusive, but is not involved in the cases at bar.

In 1901 the legislature enacted Laws 1901, chapter 180, which conferred on any employee of any railroad company unavoidably absent from his township or ward the right to present himself at the polls in any precinct in Kansas and cast an absentee ballot as therein provided, this act later appearing as G. S. 1909, sections 3312 to 3318, inclusive. By Laws of 1911, chapter 181, the first section was amended in such manner as to. permit any qualified elector who might be unavoidably absent from his township or ward and outside his county to cast an absentee ballot. In 1913 an act was passed (Laws 1913, ch. 194) "to insure greater secrecy and to prevent fraudulent voting as nonresidents" under the above act, and though not so stated explicitly was supplementary thereto. These acts now appear as R. S. 25-1001 to 25-1008, inclusive.

In 1919 the legislature enacted Laws 1919, chapter. 189, conferring on any qualified elector in the actual employ of the United States government, or in actual service in the army, navy or marine corps of the United States or militia of this state, and whose duty required him to be absent from the state on election day, the right to cast an absentee ballot as therein provided. Parts of this act were revised in 1923 and appear as R. S. 25-1101 to 25-1113, inclusive. All of this statute except R. S. 25-1107, 25-1110 to 25-1113 was amended by Laws 1929, ch. 179, now appearing as R. S. 1933 Supp. 25-1101 to 25-1106, inclusive, and 25-1108 and 25-1109. By the amendment any qualified elector actually absent from the state during all of the times the polls are open is permitted to cast an absentee ballot upon complying with the statute.

Under the statute permitting voters absent from their wards or townships and outside their counties, but within the state, to vote, it is required the voter shall present himself at the polls in some precinct and there make the affidavit prescribed in the statute (R. S.

25-1002), stating his residence in Kansas for more than six months and in his township or ward more than thirty days; that he is a duly qualified elector; that because of his duties he is required to be absent and has and will have no opportunity to vote and that he has not voted elsewhere at the particular election.

Under the statute permitting a voter absent from the state to vote, between thirty days and two days prior to the election he is required by R. S. 1933 Supp. 25-1104 to make and file with the clerk of the county in which he resides an affidavit which shall state the precinct in which he is an elector, his correct post-office address and that he is or will be necessarily absent from the state on election day, and when voting to make the affidavit required by R. S. 1933 Supp. 25-1102.

In each of the above statutes machinery is provided for the delivery of ballots and the ultimate return thereof. These provisions are not now discussed for the reason that our present concern is to determine whether the voter offers to vote in the township or ward in which he or she resides. From one standpoint, it might be said that the constitutional provision relied on by plaintiffs as requiring personal presence, does not in any manner pretend to do more than define who is a qualified elector, and that it has nothing whatever to do with the manner and form in which the election is held and the ballots of the qualified electors received. If an act may be passed requiring registration of voters ten days before election, then also the legislature might require that an elector file a written request for a ballot, the request to contain proofs of his right to vote.

The legislature has in effect divided the voters into four classes: (1) those personally present in their township or ward when they cast their ballot, (2) those in the militia or volunteer military service; (3) those in the state, but outside their township or ward and county, and (4) those outside the state. As to those in class 1, there is no question where they offer to vote in their proper township and ward. As to class 2, the members thereof certainly offer to vote in their proper townships or wards under the explicit terms of the statute enacted in their behalf by direct authorization of the constitution. As to those remaining in classes 3 and 4, it follows from our former decisions with respect to the exercise of reserved powers, from our conclusion heretofore expressed, that the constitutional provisions as to absentee-voters rights of persons in the militia or in the military service of the United States are not exclusive

of the right of the legislature to act with respect to such rights, and from the fact that although our constitution prescribes the qualifications of electors that it does not prescribe the manner or form of holding elections, that it was within its constitutional power for the legislature to provide that an offer to vote in the township or ward in which the elector resides, could be made by subscribing to the affidavit prescribed in the statutes with reference to each class.

The argument made that, under the statute with reference to voters absent from the state, electors who are physically unable to go to the polls are permitted to vote, while if they were within the state they would be denied the privilege if unable to go to the polls, is not in our opinion any sufficient. ground for holding the statutes invalid. The classification made is not unreasonable. The registration act may produce a somewhat similar result, but it was not denounced. (See *State v. Butts,* supra.)

Among other arguments, it is insisted the absentee-voters laws confer political rights on some to the exclusion of others, and that there is a distinction between the power of the legislature to act with respect to property rights where not limited by the constitution and political rights fixed by the constitution, and that in the latter case the legislature is without power. We cannot agree. The question of discrimination was urged in *Goodrich v. Mitchell,* 68 Kan. 765, 75 Pac. 1034, a case arising under the veterans preference law. In the opinion upholding the act it was said:

"It is conceded that the matter of holding office is a political privilege, but it is argued that it becomes a special privilege when a class of citizens are given a preference over all others. Our constitution differs materially from those of many of the states with respect to the granting of privileges. The only provision we have touching the subject is found in section 2 of the bill of rights, which is:

"'All political power is inherent in the people, and all free governments are founded on their authority, and are instituted for their equal protection and benefit. No special privileges or immunities shall ever be granted by the legislature, which may not be altered, revoked or repealed by the same body; and this power shall be exercised by no other tribunal or agency.'

"In most of the states the granting of special privileges or immunities is expressly prohibited; but, as will be observed, ours seemingly contemplates that such privileges may be granted, as it provides that none shall be granted that may not be altered, revoked, or repealed. The legislature may, then, exercise its judgment and discretion in the selection of officers, unhampered by restrictions, unless some are to be implied from those expressed or from the theory of our government." (p. 769.)

The statutes attacked here do not pretend to take from any qualified elector his right to vote, and the fact that voters under some circumstances may be able to vote while others cannot does not make the statutes invalid.

It is also argued that the statutes under consideration cannot be upheld because they do not preserve the secrecy of the ballot. It should be observed that the requirement of article 4, section 1 of our constitution is that "all elections by the people shall be by ballot," and *not by secret ballot,* and the matter of secrecy is one for legislative determination. The securing of secrecy in voting has been the result of gradual growth in the statutes, even though it be conceded that an election by ballot means a secret ballot. (Cf. *State, ex rel., v. Beggs,* 126 Kan. 811, 271 Pac. 400, and the concurring opinion by Dawson, J.) Our first election law after statehood was Laws 1861, chapter 28, Compiled Laws of 1862, chapter 86. Under this act ballots were not furnished by the state, county or township but presumably by the voter, candidate, or others interested in the election. Section 7 of the act provided the elector should, in full view, deliver to one of the judges a single ballot or piece of paper on which was written or printed the names of the persons voted for and a designation of the office to be filled. Under section 8 it was provided the judge, upon receipt thereof, should pronounce in an audible voice the name of the elector and if no objection was made and the judge was satisfied of the elector's right to vote, he should immediately "put the ticket in the box without inspecting the names written or printed thereon." In this particular the law was not changed until the enactment of the first "Australian ballot law" by Laws 1893, chapter 78, which made provision that ballots at general elections should be furnished by the county. This act, for the first time, made provisions for booths, shelves, pens, penholders, ink, blotters and pencils "as will enable the voter to prepare his ballot for voting, and in which voters may prepare their ballots screened from all observation as to the manner in which they do so." And further, "Said booths shall be constructed of any material that will form a screen from public view and render the voter free from observation while marking his ballot," etc. (Sec. 20.) Under section 22 of this act the voter was directed to fold his ballot so as to conceal the names of candidates and marks thereon. Under section 23, any voter declaring upon oath that he could not read the English language or that by reason of any physical disability he was unable

to mark his ballot was entitled to assistance in voting. Under section 27 it was made an offense for any person to mark or fold his ballot so as to be distinguished, or to allow his ballot to be seen with an apparent intention of disclosing his vote, to make a false statement as to inability to vote, to interfere or attempt to interfere with any person when marking his ballot, or to endeavor to induce any voter to show how he marked his ballot.

In *Taylor v. Bleakley*, 55 Kan. 1, 39 Pac. 1045, the validity of the above act was challenged. This court, in upholding it, said:

"It is next insisted if the provisions of §§ 22 and 25, referred to, are mandatory, that the statute is in conflict with § 1, article 5 of the constitution, which ordains that 'all elections by the people shall be by ballot, and all elections by the legislature shall be *viva voce.*' It is conceded that the word 'ballot' means 'a bit of paper having printed or written thereon the designation of an office, and the name of a person to fill it, and that the person casting it has a right to do so in absolute secrecy.' The cardinal features of chapter 78 are two: First, an arrangement for polling by which compulsory secrecy of voting is secured; second, an official ballot containing the names of all candidates, printed and distributed under official authority. The act compels a vote by ballot, and absolute secrecy. The marking of the vote in seclusion, and in such a uniform way as not to be readily used for identification, reaches effectively a great class of evils, including violence, intimidation, bribery and corrupt practices, dictation by employers or organizations, the fear of ridicule and dislike, or of social or commercial injury, all coercive and improper influence of every sort depending on a knowledge of the voter's political action. Voting according to a bargain or understanding is especially aimed at. No man has ever placed his money corruptly without satisfying himself that the vote was cast according to the agreement, or, in a phrase which has become only too common in elections, without proof that 'the goods were delivered;' and when there is to be no proof by any distinguishing mark, sign, or otherwise, but the word of the bribe-taker (who may have received thrice the sum to vote for the briber's opponent), it is idle to place any trust in such a use of money. (Wigmore, Australian Ballot System, 52.) A ballot ought to be cast by the voter intelligently and thoughtfully. If so cast, there is no trouble in complying with the provisions of chapter 78. If a person is illiterate or physically disabled, he may have assistants to mark his ballot. No one is disfranchised by the act, nor are the provisions concerning the marking of the ballot difficult to understand. The legislature, within the terms of the constitution, may adopt such reasonable regulations and restrictions for the exercise of the elective franchise as may be deemed necessary to prevent intimidation, bribery, and fraud, providing the voting be by ballot, and the person casting the ballot may do so in secrecy." (p. 13.)

In 1897 the above act of 1893 was amended by Laws 1897, chapter 129. The purpose of the amendment was to clarify certain parts of the original act and to expand certain of its provisions and to

add to it so that it more completely regulated the manner of holding elections and the enforcing of secrecy of the ballot. Since that time the act of 1897 has been amended and supplemented in many particulars. Illiteracy is no longer ground for procuring assistance in voting but in essence the other provisions with respect to secrecy have been maintained. By way of contrast, however, it should be noted that in the first law permitting persons absent in the military service to vote (G. S. 1868, ch. 36, art. 4, sec. 51), the elector is directed to hand to the judge of election a single ballot or piece of paper, on which should be written or printed, or partly written and partly printed, first, the county, township or ward and representative district of which he is a resident; second, the company and regiment of which he is a member, all of which shall be exposed, and—

"The ballot shall also contain the names of the persons voted for as above, with designation of the office which each is intended to fill, *which may be exposed or concealed, at the option of the elector, but if concealed, the judges shall not inspect it.*" (Italics inserted.)

This particular section has never been·amended or repealed, and now appears as R. S. 25-1207.

In the act permitting absentee voting within the state, it is provided that—

"The board of county commissioners and the county clerk of each county wherein any vote of any absent voter is received as herein provided shall keep the fact of such vote and the person for whom the same is recorded and contents thereof secret and shall not reveal or divulge the same." (R. S. 25-1005.)

In the act permitting absentee voting without the state, there is no provision with respect to secrecy.

From the above it is clear that the terms "secrecy" and "absolute secrecy" as applied to voting must be considered not alone as being included in the constitutional provision for voting by ballot, but in view of statutory provisions subsequently enacted. It would seem the first election laws went no further than to secure to the voter a right of secrecy—it was not until the enactment of the Australian ballot law that extensive measures were taken to prevent the voter from voting openly as distinguished from secretly or that tended to prevent his waiving his right to secrecy. The fact that an absentee voter could not cast his ballot in absolute secrecy was recognized in *Mathewson v. Campbell*, 91 Kan. 625, 138 Pac. 637, decided in 1914, when the right to vote as an absentee voter was restricted to voting within the state, where it was said:

"He was authorized to apply to the election board for a ballot and of necessity was given one prepared for the district in which he voted. Changes were necessary to adapt it to the district in which the absent voter resided. The changes in question were made to that end and not for identification or other wrongful _purpose. Besides, absolute secrecy is impossible in the case of an absent voter, as he is required to make an affidavit setting forth his identity, residence, right to vote in his own township or ward, and showing that he was unavoidably absent from his home. This affidavit is sealed up with the ballot which he casts and transmitted with it to the county clerk of his home county where it is opened and canvassed by the county commissioners in the presence of the county clerk. These officers necessarily know how the votes of absentees have been cast, but they are admonished by law to keep the contents of the ballot secrect and not divulge to any one for whom the votes were cast. (Laws 1901, ch. 180, Gen. Stat. 1909, §§ 3312-3318; Laws 1911, ch. 181.) This vote was legal and should have been counted in favor of appellant." (p. 631.)

In *Hooper v. McNaughton*, 113 Kan. 405, 214 Pac. 613, it was contended that nonobservance of statutory requirements with reference to secrecy was ground for rejection of votes. In the opinion by Burch, J., it was said:

"The distinction between mandatory and directory provisions of a statute lies in consequence of nonobservance. An act done in disobedience of a mandatory provision is void. While a directory provision should be obeyed, an act done in disobedience of it may still be valid. Even although the doing of an act contrary to a directory provision be punishable criminally, still the act itself may not be nugatory. Deviations from instructions contained in directory provisions are usually termed irregularities.

"The primary object of an election law, which transcends all other objects in importance, is to provide means for effective exercise of suffrage. Secrecy is subsidiary, a means to that end. To vitiate a ballot, disregard of secrecy must be so mischievous as to warrant disfranchisement. To insure secrecy, the statute requires that the curtains of voting booths must come to within two feet of the floor of the polling place. No one would contend that if the curtain of one of a number of booths at a precinct should, through inadvertence, be six inches short, the election at that precinct would be void. To insure secrecy, the statute provides that any ballot which shall have been marked or written upon with other than a pencil, shall be wholly void, and no vote thereon shall be counted. That provision is mandatory. When the legislative intention is not so plain, whether nonobservance of a regulation avoids a ballot, depends on the intimacy of the relation between the regulation and the general purpose to be accomplished, and the nature and extent of the departure. Generally, a voter may be held to strict compliance with rules laid down for his own guidance. Generally, he is not disfranchised for noncomformity by others with rules laid down for their guidance. Generally, innocent voters are not disfranchised on account of the conduct of other individual voters. Contestants for office may have illegal ballots thrown out, but the legal votes of a precinct may not also be thrown out, unless conduct has been so flagrant as to corrupt the entire vote." (p. 407.)

If it be said that the constitutional provision of vote by ballot means a secret ballot, does that mean that any ballot not cast in absolute secrecy is void? If so, what of our statutes with reference to preserving identity of challenged votes? And what of our statutes with reference to the physically disabled voter? And of what effect is article 5, section 4, conferring on the legislature the right to pass laws for ascertaining by proper proofs the citizens who shall be entitled to the right of suffrage? Or is it a more rational conclusion to say that the secrecy is a right granted to the citizen, which, like many other rights, may be waived? If the latter be true, then it was within the legislative power to provide that certain classes of voters, by the mere act of voting, could waive their right of secrecy. We are aware that courts of other states have arrived at contrary conclusions, but at least in some cases it is because of constitutional provisions. In *Clark v. Nash,* 192 Ky. 594, 234 S. W. 1, 19 A. L. R. 304, it was held that an absentee-voters law could not be passed for the reason the constitution provided:

"All elections by the people shall be by secret official ballot, furnished by public authority to the voters at the polls, and marked by each voter in private at the polls, and then and there deposited." (p. 596.)

And see, also, the notes in 14 A. L. R. 1257 and 35 A. L. R. 819 heretofore referred to, and in 90 A. L. R. 1362, and Cooley's Constitutional Limitations (7th ed.), p. 910 *et seq.*

In addition to the decisions above, there are cases from other jurisdictions which our limited time and space prevent discussing. There are also other Kansas cases interpreting our election laws, especially the provisions of the Australian ballot law and its amendments and supplements, but in none of the latter is the question of waiver of the right of secrecy discussed.

We are of opinion that the constitutional right of a voter to cast his vote in secrecy is a right which, where he is not prevented therefrom by positive statutory enactment, he may waive, and that provisions of statutes for absentee voting by certain classes of voters may not be stricken down as unconstitutional if, by fair interpretation, it may be said the voter, in casting his ballot under them, has waived his right of secrecy. So considered, the provisions of our absentee-voters laws are not unconstitutional.

The writs of mandamus prayed for are denied.

The time within which a petition for rehearing may be filed is fixed at five days from the date of filing hereof.

HARVEY, J., not sitting.